*Exhibit O*

Bashir Chaudry                                    February 20, 2012

**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION
TOP TOBACCO, L.P. and          )
REPUBLIC TOBACCO, L.P.,        )
                               )
          Plaintiffs,          )
                               )    Case No.
     vs.                       )    1:11-cv-04460
                               )
MIDWESTERN CASH AND CARRY,     )
LLC, MIDWEST CASH AND CARRY    )
GROCERY, INC., f/k/a CASH      )
AND CARRY, INC., MIDWEST       )
DISTRIBUTORS WAREHOUSE,        )
INC., NUSRAT H. CHOUDHRI,      )
SABRA CHOUDHRI, BASHIR         )
CHAUDRY, MUBBASHER KHAN,       )
ZUBAIR KHAWAJA, MUZAFAR ALI,   )
YALE GAS AND FOOD, INC.,       )
SOUTHERN GAS AND FOOD, INC.,   )
SOUTH CHICAGO ONE, INC.,       )
d/b/a CLARK GAS AND FOOD,      )
MUDANJIANG BASES IMPORT &      )
EXPORT LLC, d/b/a.             )
MUDANJIANG BASES CO., LTD.,    )
and TANG QIWEN,                )
                               )
          Defendants.          )
```

TAKEN ON FEBRUARY 20, 2012

The videotaped deposition of BASHIR
CHAUDRY, called for examination, taken pursuant to
the provisions of the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions for the
purpose of discovery, taken before Elia E. Carrion,

**Page 2**

1   CSR No. 084.004641, a Certified Shorthand Reporter
2   of the State of Illinois, at Suite 1900, 525 West
3   Monroe Street, Chicago, Illinois, on the 20th day of
4   February A.D. 2012, at 12:38 a.m.
5
6   PRESENT:
7
8       KATTEN MUCHIN ROSENMAN LLP,
9       (525 West Monroe Street,
10      Chicago, Illinois 60661-3693,
11      Tel: 312-902-5200), by:
12      MS. SHARYN M. CASTLE,
13      sharyn.castle@kattenlaw.com,
14          appeared on behalf of the Plaintiffs;
15
16
17
18
19
20
21
22
23
24

**Page 3**

1   PRESENT:  (Continued)
2
3       PONTIKES & ASSOCIATES,
4       (33 North LaSalle Street, Suite 3350,
5       Chicago, Illinois 60602,
6       Tel: 312-464-1440), by:
7       MR. STEVEN M. PONTIKES,
8       spontikes@pontikeslaw.com,
9           appeared on behalf of the Defendants
10      Midwestern Cash and Carry, LLC, Midwest
11      Cash and Carry Grocery, Inc., f/k/a
12      Cash and Carry, Inc., Midwest
13      Distributors Warehouse, Inc., Nusrat H.
14      Choudhri, Sabra Choudhri, Bashir Chaudry,
15      Mubbasher A. Khan, Zubair Khawaja,
16      Muzafar Ali, Yale Gas and Food, Inc.
17
18
19
20
21  VIDEOTAPED BY:  MR. KEVIN DAILEY
22
23  REPORTED BY:  ELIA E. CARRION, CSR,
24          CERTIFICATE NO. 084.004641.

**Page 4**

1       THE VIDEOGRAPHER:  Good afternoon.  We're going
2   on the video record at 12:38 p.m.  My name is Kevin
3   Dailey, and I'm the legal videographer in
4   association with Esquire Deposition Solutions.  Our
5   address is 311 West Monroe, Chicago, Illinois.  The
6   court reporter is Elia Carrion, also of Esquire
7   Deposition Solutions.
8       Here begins the videotaped deposition of Bashir
9   Chaudry taking place at 525 West Monroe, Chicago,
10  Illinois.  Today's date is February 20th, 2012.
11  This deposition is being taken in the matter of TOP
12  Tobacco LP and Republic Tobacco LP versus Midwestern
13  Cash and Carry LLC, et al., being heard before the
14  United States District Court for the Northern
15  District of Illinois Eastern Division.
16      Will Counsel please state their names for the
17  record.
18      MS. CASTLE:  I'm Sharyn Castle with the law
19  firm of Katten Muchin Rosenman, and I represent
20  plaintiffs in this matter, TOP Tobacco LP and
21  Republic Tobacco LP.
22      MR. PONTIKES:  Steven Pontikes representing
23  Bashir Chaudry, as well as other defendants, except
24  for the Chinese foreign nationals.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                        February 20, 2012

---

5

1    THE VIDEOGRAPHER: And will the reporter please
2  swear in the witness.
3        (WHEREUPON, the witness was duly
4        sworn.)
5        BASHIR CHAUDRY,
6  called as a witness, having been duly sworn, was
7  examined and testified as follows:
8        EXAMINATION
9  BY MS. CASTLE:
10   Q.  Mr. Chaudry?
11   A.  Yes.
12   Q.  Thank you for making some time today to
13  attend this deposition. Your Counsel informed us
14  before we went on the record that you have not sat
15  for any prior depositions.
16       Is that true?
17   A.  That's right.
18   Q.  So this is your first deposition?
19   A.  This is my first time.
20   Q.  Okay. We're going to go over some ground
21  rules and some basic housekeeping matters before we
22  get into the questions.
23   A.  Okay.
24   Q.  So this is going to work where I ask you

---

6

1  questions and I expect you to answer. Your Counsel
2  may at times object, and that's normal. Unless he
3  instructs you not to answer, you should answer my
4  questions. If you don't understand my question,
5  please let me know and I will rephrase it.
6   A.  Okay.
7   Q.  Okay. We need to have verbal answers.
8  So I can't have you shaking your head yes or no or
9  no mm-hmm or any other sort of non-verbal cues.
10  When I ask you a question, I'll need you to answer
11  it audibly so that we can hear it and so our court
12  reporter can take down everything that you say.
13   A.  Okay.
14   Q.  Okay. One thing that I know, we had this
15  issue with another deposition, we need you to speak
16  up. So as you can see, you're being video recorded
17  and the court reporter is taking down everything
18  that we say here, but we all need to be able to hear
19  you, especially the court reporter. So please be
20  sure to keep your voice up and, you know, elevate
21  your voice, if you can.
22   A.  Okay.
23   Q.  Do you -- are there any -- do you have
24  any impairments which may prohibit you from

---

7

1  providing accurate testimony today?
2   A.  No.
3   Q.  Do you have any impairments which would
4  prohibit you from giving truthful testimony today?
5   A.  No.
6   Q.  Okay. So you understand that you're
7  under oath to provide truthful and honest answers?
8   A.  I do.
9   Q.  Okay. So that's all for the housekeeping
10  matters. We can start getting into some questions.
11       Can you just state your full name for the
12  court reporter. And if you could spell your last
13  name. I know that we had it misspelled initially,
14  but...
15   A.  Okay. Bashir Chaudry. B-A-S-H-I-R; last
16  name, C-H-A-U-D-R-Y.
17   Q.  Now, I know that you have the same last
18  name as a couple of the other defendants in this
19  case. Is there any relationship between you and
20  Mr. Nusrat Choudhri?
21   A.  No.
22   Q.  So just because you have similar sounding
23  last names, you are not related to him at all?
24   A.  No. We are not related, but it's similar

---

8

1  family name look like, you know, but he spell it
2  different. I spell it different.
3   Q.  But no relation?
4   A.  No relation.
5   Q.  And do you have any relation to his wife
6  who also shares his same last name?
7   A.  No.
8   Q.  All right. So it's just a common --
9   A.  Just --
10   Q.  -- name?
11   A.  Just a common name.
12   Q.  Okay.
13   A.  Lot of people have that name.
14   Q.  Okay. And I also want to -- well, we'll
15  get to that. But if you could just tell me, where
16  were you born?
17   A.  In Pakistan.
18   Q.  And when -- when were you born?
19   A.  I was born in Pakistan, a district called
20  Shikarpur. In '64.
21   Q.  1964?
22   A.  (No audible response.)
23   Q.  And when did you move to the
24  United States?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                        February 20, 2012

9

1     A.   '90, 1990.
2     Q.   1990.
3          And do you own any companies here in the
4     United States?
5     A.   Yes, I do.
6     Q.   What companies do you own?
7     A.   South Chicago One, Inc.
8     Q.   South Chicago One, Inc.?
9     A.   Mm-hmm.
10    Q.   Also a defendant in this lawsuit,
11    correct?
12    A.   I'm sorry.  Say again.
13    Q.   South Chicago One, Inc. is also a named
14    defendant?
15    A.   The -- the name is there, you know.
16    Q.   Yes.  In this lawsuit?
17    A.   Right.
18    Q.   Do you have any other ownership interests
19    in any other companies?
20    A.   Different business.
21    Q.   What is the different business?
22    A.   I have another convenience store on north
23    side.
24    Q.   And what is the name of that convenience

10

1     store?
2     A.   IBNN, Inc.
3     Q.   IBNN, Inc.?
4     A.   Right.
5     Q.   Like the letters "IB" --
6     A.   Right.
7     Q.   -- "NN," Inc.?
8     A.   Right.
9     Q.   And where is that located?
10    A.   On 3635 West Armitage.
11    Q.   Okay.  And it is a -- it's not a gas
12    station?
13    A.   No.
14         MR. PONTIKES:  So it's a convenience store.
15    BY THE WITNESS:
16    A.   Convenience store.
17    BY MS. CASTLE:
18    Q.   Okay.  Do you sell TOP products there?
19    A.   Yes.
20    Q.   You sell TOP rolling papers -- cigarette
21    rolling papers there?
22    A.   Yes.
23    Q.   Okay.  Do you own any other business
24    interests in -- in Chicago?

11

1     A.   I do.
2     Q.   What other business interests do you own?
3     A.   I have a -- a partnership at the gas
4     station, another gas station.
5     Q.   Where is that gas station located?
6     A.   59 and Racine.
7     Q.   And what is the name of that gas station?
8     A.   Oh, Chack, Inc.
9     Q.   I'm sorry?
10    A.   Chack.
11    Q.   Could you spell that?
12    A.   C-H-A-C-K, Chack, Inc.
13    Q.   C-H- --
14    A.   A-C-K.
15    Q.   C-H-A-C-K?
16    A.   Inc., Incorporated.
17    Q.   Oh, okay.  And what is the name of the
18    gas station?
19    A.   Marathon.
20    Q.   Marathon.
21         Okay.  And just for clarity's sake, what
22    is the name of the gas station that your company
23    South Chicago One, Inc. owns?
24    A.   Clark.

12

1     Q.   Is that referred to as Clark Gas and
2     Food?
3     A.   Right.
4     Q.   Okay.  Do you own any other business --
5     A.   No.
6     Q.   -- interests?
7     A.   No.
8     Q.   Do you own any other business interests
9     in Chicago?  Sorry.
10         MR. PONTIKES:  Excuse me.
11    BY THE WITNESS:
12    A.   You mean the --
13         MS. CASTLE:  No, no.  I'm sorry, can I strike
14    that last question.
15    BY MS. CASTLE:
16    Q.   Do you own any other business interests
17    in the United States?
18    A.   Not business.
19    Q.   Okay.  Any other -- do you own any other
20    companies?
21    A.   Yes, the real estate.
22    Q.   You own a real estate company?
23    A.   Yeah.
24    Q.   What is the name of your real estate



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

13

1  company?
2      A.  BCCI.
3      Q.  BCCI.
4          And where is BCCI located?
5      A.  Well, we own couple of, you know, small
6  pieces of properties.
7      Q.  Where is the headquarters for BCCI?
8      A.  Just I run it from home, you know.
9      Q.  Okay.
10     A.  Like -- like small, you know.
11     Q.  Okay.  And you own several properties,
12 did you say?
13     A.  Yeah.
14     Q.  Are they residential?
15     A.  No.  Residential plus commercial.
16     Q.  Okay.  So let me just make sure I
17 understand you correctly.  You own an interest in a
18 convenience store in Chicago; two gas stations, one
19 of which is a named defendant in this lawsuit; and a
20 real estate company?
21     A.  Right.
22     Q.  Did I miss any of your business interests
23 or --
24     A.  No.

14

1      Q.  -- entities?
2      A.  No, no.
3      Q.  So that's it?
4      A.  That's it.
5      Q.  Okay.  So you own -- you're obviously a
6  businessman, own several businesses.  What is
7  your -- what is your title with respect to South
8  Chicago One, Inc.?
9      A.  I'm president.
10     Q.  President.  Okay.
11     MS. CASTLE:  At this time, I just want to mark
12 two documents as exhibits.
13 BY MS. CASTLE:
14     Q.  Mr. Chaudry, we're going to mark your
15 Amended Deposition Notice as Exhibit 32.  The court
16 reporter is going to mark it.  And we're going to
17 have the court reporter mark as Exhibit 33 the
18 Rule 30(b)(6) Deposition Notice for South Chicago
19 One.
20         (WHEREUPON, a certain document was
21         marked Plaintiffs' Exhibit No. 32,
22         for identification, as of this
23         date.)
24         (WHEREUPON, the document was

15

1          tendered to the witness.)
2          (WHEREUPON, a certain document was
3          marked Plaintiffs' Exhibit No. 33,
4          for identification, as of this
5          date.)
6          (WHEREUPON, the document was
7          tendered to the witness.)
8      MS. CASTLE:  Steve, are you offering this
9  witness as the Rule 30(b)(6) deponent for South
10 Chicago One?
11     MR. PONTIKES:  He's the only person.
12     MS. CASTLE:  So he is --
13     MR. PONTIKES:  He's the owner.
14     MS. CASTLE:  So he'll be the 30(b)(6)?
15     MR. PONTIKES:  Yeah.  It's -- I don't know
16 exactly what the corporation is, but he's the only
17 person who manages it, so.
18     MS. CASTLE:  Okay.
19 BY MS. CASTLE:
20     Q.  So Mr. Chaudry, you have in front of you
21 Exhibits 32 and 33.  One is a deposition notice for
22 your deposition personally, and one is a deposition
23 notice called a Rule 30(b)(6) Deposition Notice on
24 your company, South Chicago One, Inc.

16

1          And you'll be testifying on your behalf
2  and also on behalf of your company?
3      A.  Yes.
4      Q.  Okay.
5      MR. PONTIKES:  'Cause nobody else knows what
6  you know about your company, right?
7      THE WITNESS:  No.
8      MR. PONTIKES:  Okay.
9  BY MS. CASTLE:
10     Q.  Okay.  So what are your responsibilities
11 with respect to Clark Gas and Food?  And just for
12 clarity's sake, I'm not going to refer to South
13 Chicago One, Inc. as South Chicago One, Inc.
14 throughout this dep.  I'm going to refer to them as
15 Clark Gas and Food.
16     A.  That's fine.
17     MR. PONTIKES:  No problem.
18 BY MS. CASTLE:
19     Q.  And when I -- when I call them Clark Gas
20 and Food, you'll know what I'm talking about, right?
21     A.  Okay.
22     Q.  Okay.  So what are your responsibilities
23 with respect to Clark Gas and Food?
24     A.  Well, I manage it, you know, day-to-day



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                           February 20, 2012

17

1    basis; buy stuff, order stuff, everything, you know,
2    to manage it.
3        Q.   Do you work there?  Are you there every
4    day working?
5        A.   Almost every day.
6        Q.   Okay.
7        A.   I do have help there, too.
8        Q.   Okay.  So how many employees do you have
9    at Clark Gas and Food.
10       A.   Four.
11       Q.   Four employees.
12           What are their names?
13       A.   Azad Rafiq, and myself there, and there's
14   one guy, Waheed Ahmed.  Waheed Ahmed, W-A-H-E-E-D;
15   A-H-M-E-D, Ahmed.
16       Q.   So was there one more?  You said there
17   was four.
18       A.   Yeah, there was Azad.  His wife, it's not
19   coming in my mind.
20       Q.   His wife works for you as well?
21       A.   Yeah.  His wife work there too.
22       Q.   Okay.  And when you work there, do you
23   work behind the counter as well as in an office?
24       A.   Well, sometime I do work on the counter,

18

1    but mostly, you know, I bring the stuff, place the
2    order, bring the inventory, set it up.
3        Q.   Are you responsible for purchasing
4    products?
5        A.   I do.
6        Q.   Okay.  Are you responsible for purchasing
7    tobacco-related products?
8        A.   Yes.
9        Q.   Okay.  And I take that you're also
10   responsible for purchasing TOP cigarette rolling
11   papers?
12       A.   Yes.
13       Q.   Okay.  Have you ever made any purchases
14   from my client, Republic Tobacco?
15       A.   No.
16       Q.   Okay.  Have you ever made any purchases
17   from Midwestern Cash and Carry, LLC?
18       A.   Tobacco?  TOP paper?
19       Q.   Yes.
20       A.   Might be, but we usually buy it from
21   Dearborn.
22       Q.   But have you made purchases of
23   tobacco-related products from Midwestern Cash and
24   Carry, LLC?

19

1        A.   We do sometime, maybe short --
2        Q.   Okay.
3        A.   -- because they are located on north side
4    and we are south side, so Dearborn is more close to
5    us.
6        Q.   But you have in the past made purchases
7    from --
8        A.   We did.
9        Q.   Have you ever made any purchases from
10   Midwest Cash and Carry, Inc.?
11       A.   We usually call cash and carry --
12       MR. PONTIKES:  Yeah, do you know the difference
13   between Midwest Cash and Carry, Inc. and Midwest
14   LLC?
15       THE WITNESS:  No.
16       MR. PONTIKES:  Yeah.  Go ahead.
17   BY MS. CASTLE:
18       Q.   Okay.  So we'll focus on Midwestern Cash
19   and Carry, LLC.  Do you recall ever having made
20   purchases of TOP cigarette rolling papers from
21   Midwestern Cash and Carry, LLC?
22       A.   We might, you know, but --
23       MR. PONTIKES:  You got that, "we might"?
24       THE WITNESS:  Yeah.

20

1    BY THE WITNESS:
2        A.   Because it's a very, very low sale, you
3    know, because if you buy it one time it's like, you
4    know, two or three months it's good enough.  You
5    just --
6        MR. PONTIKES:  She just wants to know, do you
7    remember one way or another whether you ever bought
8    from Midwest?
9    BY THE WITNESS:
10       A.   We buy it, you know, but we do -- we
11   usually buy it from Dearborn.
12   BY MS. CASTLE:
13       Q.   Now, do you buy for your other gas
14   station in your convenience store?  Do you buy at
15   the same time?  I mean, for example, if you --
16       A.   No, no.
17       Q.   Okay.  You buy separately --
18       A.   No.
19       Q.   -- for the different stores that you own?
20       A.   Another one, I don't manage it.  I just,
21   you know, look after one.
22       Q.   Yeah.  The other gas station --
23       A.   Right.
24       Q.   -- the Marathon?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                          February 20, 2012

21

1   A.   Right.
2   Q.   So you don't --
3   MR. PONTIKES:  Just so you know, you're both
4   talking at the same time, and I don't know if she's
5   getting it all.
6   BY MS. CASTLE:
7   Q.   Okay.  So for your Marathon gas station,
8   are you in charge of buying products for that gas
9   station?
10  A.   No, no.
11  Q.   For your convenience store, are you in
12  charge of buying products for that --
13  A.   No.
14  Q.   -- for that convenience store?
15  A.   No.
16  Q.   Okay.  So you're only in charge of making
17  purchases of products for the Clark Gas and Food?
18  A.   Right, me and one more.  You know, I have
19  help.  If I'm not there, he -- he place the order
20  too.
21  Q.   Who else places the order?
22  A.   If I'm not there, I have --
23  THE COURT REPORTER:  Sorry, could you repeat
24  that?

22

1   BY THE WITNESS:
2   A.   I have a helper over there, he usually go
3   to the Dearborn and pick up stuff too.
4   BY MS. CASTLE:
5   Q.   And who is that who helps you?
6   A.   Ali.
7   Q.   Ali?  I'm sorry.
8   A.   A-Z-A-D.  Azad Ali.
9   A.   Azad Ali.
10       Is that who you mentioned earlier --
11  A.   Right.
12  Q.   -- as working for you?  Okay.
13       What other products do you purchase from
14  Midwestern Cash and Carry, LLC?
15  A.   Well, we buy soda sometimes.
16  Q.   I'm sorry?
17  A.   Soda.
18  Q.   Soda?
19  A.   Yeah.  And water, tissue paper.  Once we
20  short something, you know, we pick it up from there.
21  Q.   Okay.  How often do you place orders with
22  Midwestern Cash and Carry, LLC?
23  A.   Usually we go buy, pick it up ourself,
24  you know.

23

1   Q.   How often do you place orders with them?
2   A.   Maybe twice a month, once a month.
3   Q.   How does it work when you place an order
4   with Midwestern Cash and Carry, LLC?  Could you walk
5   me through your whole purchase?
6   A.   No, we don't usually place the order.  We
7   pick up the stuff from there.  You know, it's a
8   walk-through.  You can go buy stuff and put it in
9   your cart, bring it.
10  Q.   Okay.  So it's sort of like a Sam's Club
11  or a Costco?
12  A.   Right.  We do go Sam's Club too, Dearborn
13  too.
14  Q.   Where else do you buy --
15  A.   Sam's Club, Dearborn.
16  Q.   Hold on, let me finish my question.
17       Where else do you buy TOP cigarette
18  rolling papers from?
19  A.   Dearborn mostly.
20  Q.   And where else?  Where else have you ever
21  bought TOP cigarette rolling papers from?
22  A.   There's one place on Lawrence called
23  discount tobacco.
24  Q.   Lawrence Discount?

24

1   A.   Lawrence Discount, right.
2   Q.   Uh-huh.
3   A.   We buy from them too.
4   Q.   Okay.  So let me just see if I understand
5   you correctly.
6       You've purchased TOP cigarette rolling
7   papers from Lawrence Discount?
8   A.   That's right.
9   Q.   Dearborn Wholesale?
10  A.   Right.
11  Q.   And are you testifying today that you
12  don't recall whether you've purchased TOP cigarette
13  rolling papers from Midwestern Cash and Carry, LLC?
14  A.   We might have bought it, you know.
15  MR. PONTIKES:  "We might have bought it"?
16  BY THE WITNESS:
17  A.   Yeah.
18  BY MS. CASTLE:
19  Q.   Okay.
20  A.   Because as I said, it's not like big
21  item, so once you buy like couple of, you look at
22  very closely.
23  Q.   Have you ever purchased from a company
24  called Pulaski Discount?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

25

1    A.   No.
2    Q.   What about Country Bright Imports?
3    A.   No.
4    Q.   Have you ever heard of a company called
5  Country Bright Imports?
6    A.   No.
7    Q.   What about Hinsdale, Inc.?
8    A.   No.
9    Q.   What about Blackstone, Inc.?
10   A.   No.
11   Q.   Elston Wholesale?
12   A.   No.
13   Q.   Have you ever heard of a company called
14  Mudanjiang?
15   A.   No.
16   MS. CASTLE:  It's M-U-D-A-N-J-I-N-G.
17  BY MS. CASTLE:
18   Q.   What about -- do you know Kay Qiwen,
19  Q-I-W-E-N?
20   A.   No.
21   Q.   Have you ever bought TOP cigarette
22  rolling papers online?
23   A.   No.
24   Q.   Have you ever heard of a website called

26

1  Ali Baba?
2    A.   No.
3    MR. PONTIKES:  The 40 thieves are out.
4  BY THE WITNESS:
5    A.   Ali Baba, [unintelligible] that's in my
6  language.
7  BY MS. CASTLE:
8    Q.   Do you sell any other cigarette rolling
9  papers other than TOP brand?
10   A.   We do.
11   Q.   What other brands do you sell?
12   A.   It's called 1.5 and 1.25.
13   Q.   What is it?
14   A.   1.5 and 1.25.
15   Q.   Okay.  Any other brand of --
16   A.   No.
17   Q.   -- cigarette rolling papers?
18   A.   No.
19   MR. PONTIKES:  What about JOB?
20  BY THE WITNESS:
21   A.   No, JOB.  I think there's number 1.0 or,
22  you know, 1.0 or .1.
23  BY MS. CASTLE:
24   Q.   But you don't sell any other brands?

27

1    A.   No.
2    MR. PONTIKES:  No, those are brands.
3  BY THE WITNESS:
4    A.   Those are brands.  1.25.
5  BY MS. CASTLE:
6    Q.   Oh, okay.
7    A.   I don't know what company is that.  All I
8  see is the number on it.
9  BY MS. CASTLE:
10   Q.   Okay.  If we can just back up 'cause you
11  talked a little bit about how you make purchases
12  from Midwestern Cash and Carry, LLC.  Now, let me
13  just see if I understand you correctly.
14       You go to their warehouse?
15   A.   Right.
16   Q.   You pick up the items that you want to
17  purchase?
18   A.   Right.
19   Q.   And then you go check out at a check-out
20  counter?
21   A.   Yeah, check-out.
22   Q.   Okay.  How do you typically pay for your
23  purchases from Midwestern Cash and Carry, LLC?
24   A.   It's a cash and carry.

28

1    MR. PONTIKES:  Cash or check, she's asking.  Do
2  you remember?
3  BY THE WITNESS:
4    A.   Cash.
5  BY MS. CASTLE:
6    Q.   You pay in cash?
7    A.   Yeah.
8    Q.   Do you ever pay with a check?
9    A.   No.
10   Q.   Do you ever pay with a credit card?
11   A.   No.
12   Q.   Do you ever trade goods?
13   A.   No.
14   Q.   So you always pay in cash?
15   A.   That's the only thing they will accept,
16  you know, I don't know they accept check or not.
17   Q.   Okay.  So you just pay in cash?
18   A.   Yeah.
19   Q.   Okay.  Do you recall whether you've ever
20  seen boxes of the TOP cigarette rolling papers at
21  their warehouse?
22   A.   No.  We just go to the counter, you know,
23  that's it.  You pick up the stuff, come to the
24  counter, and you pay.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free:  800.211.DEPO
Facsimile:  312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                          February 20, 2012

29

1  Q.  I'm asking when you go pick up the stuff
2  -- when you go pick up the products that you want to
3  purchase, for example, do you recall ever seeing the
4  boxes of TOP cigarette rolling papers?
5  A.  No, no.
6  MR. PONTIKES:  Just for the record, I will
7  object -- object.  When you say "boxes," do you mean
8  the booklet, the boxes have the booklets or --
9  BY THE WITNESS:
10  A.  They put it on the shelf, like this is
11  the small box.
12  BY MS. CASTLE:
13  Q.  So they put -- describe how they are on
14  the shelves for me, 'cause I don't know.  I've never
15  seen it.
16  A.  Okay, so like I would say like two-inch
17  by three-inch box.  So they put it one in each
18  other, three and four.
19  Q.  Okay.
20  A.  Usually there are two, three sitting, you
21  know, small, small boxes, 1.25, 1. -- you know, TOP
22  paper, and you just pick it up, you know what you
23  need it.
24  Q.  So you buy by the box?

30

1  A.  Yeah.  Each box has like 24 pieces, I
2  think, yeah.
3  Q.  Yes.
4  And so you just take the box off the
5  shelf and you buy the box?
6  A.  Right.
7  Q.  Okay.  Do you ever buy a case?
8  A.  No, no, no.
9  Q.  Okay.  So you buy by the box?
10  A.  Right.
11  Q.  Okay.
12  A.  That's going to be --
13  Q.  Just checking.
14  A.  For 5 years, one case.
15  Q.  Five years?
16  Do you -- do you recall how much you pay
17  for a box of TOP cigarette rolling papers?
18  A.  I think it used to be $15 or $16.  Now
19  it's a little bit more.  I think $18.
20  Q.  Okay.  Where do you -- in your gas
21  station at Clark Gas and Food, where are the TOP
22  cigarette rolling papers located?
23  A.  Right on the right side on the front
24  where you keep cigar paper, all together.

31

1  Q.  So can a customer come into your gas
2  station and --
3  MS. CASTLE:  Bless you.
4  MR. PONTIKES:  Excuse me.
5  BY MS. CASTLE:
6  Q.  Okay.  So can a customer come into your
7  gas station and pick up a packet of --
8  A.  No.
9  Q.  -- TOP cigarette rolling papers?
10  Or is it behind the counter?
11  A.  No, it's the south side.  It's a
12  bulletproof in the front.
13  MR. PONTIKES:  You don't know the area, but --
14  BY MS. CASTLE:
15  Q.  Okay.
16  A.  They will pick it up, then they won't
17  pay.
18  Q.  Oh, okay.  So the rolling papers are
19  behind the counter, behind the bulletproof --
20  A.  Right.
21  Q.  -- wall, essentially?
22  A.  Right.
23  Q.  Okay.  Now I have a better understanding
24  of where you're working.

32

1  MR. PONTIKES:  This isn't Hyde Park, so you
2  know.
3  MS. CASTLE:  Yeah.
4  BY MS. CASTLE:
5  Q.  Okay.  Do you -- I want to talk about
6  your file management and information management at
7  your gas station.  Do you maintain any sort of
8  customer database?
9  A.  No.
10  Q.  Okay.  Just checking.
11  MR. PONTIKES:  Go ahead.
12  MS. CASTLE:  Just checking.
13  MR. PONTIKES:  I doubt that there would be
14  legitimate names.  I know you're just asking.
15  MS. CASTLE:  Yeah.  I -- I understand.
16  BY MS. CASTLE:
17  Q.  Do you maintain any sort of order
18  management system or inventory management system?
19  A.  No.
20  Q.  Okay.  How do you -- here, let's say
21  this:  Do you have any sort of -- do you keep your
22  files on a computer?
23  A.  No.
24  Q.  You have all paper files?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

33

1  A. All paper files. I don't know that much
2  computer.
3  Q. Okay.
4  MR. PONTIKES: Join the club.
5  BY MS. CASTLE:
6  Q. So you don't keep track of, you know,
7  inbound and outbound payments, accounts receivable,
8  you don't keep track of any of that on a computer?
9  A. No.
10  Q. Accounts payable, not on a computer?
11  A. No.
12  Q. Do you just keep, then, paper invoices
13  and paper files?
14  A. That's right.
15  Q. Okay. Where do you maintain those files?
16  Where are those files located?
17  A. Usually it's comes on a daily basis
18  bills, you know, we put it together, we put it in
19  the pile, and put it on the side.
20  Q. Is there an office at Clark Gas and Food
21  where those file cabinets are maintained?
22  A. No. We have small place, you know, we
23  keep it there.
24  Q. You keep it at the gas station?

34

1  A. Yes.
2  Q. Okay. So you don't have an office there,
3  but you have like a small filing area?
4  A. Right, right.
5  Q. Okay. I just want to go back and talk a
6  little bit more about your purchasing from
7  Midwestern Cash and Carry, LLC --
8  A. Okay.
9  Q. -- so I just get a better idea of how you
10  make purchases from them.
11  Do you ever fill out purchase orders?
12  A. No.
13  Q. No.
14  Do they ever deliver products to you?
15  A. Sometimes soda. We ask them to deliver,
16  they deliver.
17  Q. Okay. What products do they deliver?
18  A. Like Pepsi, Coke, or, you know, juices.
19  Q. Okay. Okay. When you purchase from --
20  so you -- let me back up.
21  You said you purchased TOP cigarette
22  rolling papers from Dearborn Wholesale, correct?
23  A. Yes.
24  Q. Now, could you walk me through a purchase

35

1  at Dearborn Wholesale? How does that work?
2  A. Same thing. You can go pick it up
3  yourself there and bring it to the, you know, front
4  cashier and check it out. Give you a number, ID
5  number, and they put it, order in the computer, and
6  pay money, and take it.
7  MR. PONTIKES: The ID number, so you're clear
8  is you have to have a number, 'cause you have to
9  have a tax number to get them.
10  BY MS. CASTLE:
11  Q. Okay. So you need an ID number also to
12  shop at Midwestern Cash and Carry, LLC?
13  A. Yes.
14  Q. So when you check out, you give them your
15  ID number and they put that into a --
16  A. They put it in the system.
17  Q. -- put it in a computer?
18  A. Yes.
19  Q. Okay.
20  MR. PONTIKES: I'd only object to what he
21  thinks they do, but that's fine.
22  MS. CASTLE: I understand.
23  BY MS. CASTLE:
24  Q. I'm -- I'm just saying, do you see

36

1  them -- how do you give them your customer ID
2  number?
3  MR. PONTIKES: Well, can you -- I don't really
4  think it's a customer ID number, although he may
5  call it that. It's -- it's a tax number.
6  MS. CASTLE: Okay.
7  MR. PONTIKES: So it's not like, you know, my
8  customer ID number is 16, but my tax number is 36,
9  dash, whatever.
10  MS. CASTLE: I got it. Okay.
11  BY MS. CASTLE:
12  Q. How do you give them your tax ID number
13  or your --
14  A. Yeah, You give them a number, they put it
15  in.
16  Q. So you don't have like a swipe card --
17  A. No.
18  Q. -- or anything?
19  A. No.
20  Q. You just tell them your number?
21  A. Right.
22  Q. And they enter it in a system?
23  A. Right. Right.
24  Q. Okay. Do you pay cash at Dearborn



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                        February 20, 2012

37

1    Wholesale as well?
2        A.   Yes.
3        Q.   Okay.  I'm going to have you -- this
4    becomes a little interactive --
5        MR. PONTIKES:  Yeah.  I asked him about this
6    already, but go ahead and ask him, put it on the
7    record.  I don't think he has a clue what it is.
8    And to be honest, I don't know what it is.  You got
9    it from us, right?
10       MS. CASTLE:  Yes.
11       MR. PONTIKES:  I'm going to have to ask Bill
12   where he --
13       MS. CASTLE:  We just need to know who gave it
14   to you.  I mean --
15       MR. PONTIKES:  I want to know where it is.  I
16   mean, where it came from, too.
17       MS. CASTLE:  Yeah.  I mean, it -- okay, so
18   let's -- why don't you -- Steve knows the drill
19   here.  So if you just want to open that screen,
20   we're going to --
21       MR. PONTIKES:  Now, you know about the -- that
22   flash drive we gave on Friday?
23       MS. CASTLE:  Yes.
24       MR. PONTIKES:  Okay.  He doesn't know anything

38

1    about that, obviously, but this -- I asked him --
2    and ask him -- you can ask him too, but I don't
3    think he's got a clue where it comes from.
4    BY MS. CASTLE:
5        Q.   So this is -- this is a -- this is a
6    video that's been previously marked as Deposition
7    Exhibit 6, and I'm going to have you just take a
8    look at -- there's a few files on there, a few video
9    files --
10       MR. PONTIKES:  How do you get this on?
11   BY MS. CASTLE:
12       Q.   -- and if you could --
13       MS. CASTLE:  You should just be able to touch a
14   key and it --
15       MR. PONTIKES:  Oh, there it is.
16   BY THE WITNESS:
17       A.   Now it's coming up.
18   BY MS. CASTLE:
19       Q.   So do you see, there should be four files
20   --
21       MR. PONTIKES:  There's nothing there.
22       MS. CASTLE:  Okay.
23   BY MS. CASTLE:
24       Q.   Well, let's wait for that to warm up and

39

1    I can ask you some additional questions about
2    Exhibit 6 in a minute.
3        MR. PONTIKES:  Go ahead.
4    BY MS. CASTLE:
5        Q.   We're going to take a look at another --
6    at some other documents that have been previously
7    marked as --
8        MR. PONTIKES:  You know what, can I get a copy
9    of those, too, when you get a chance, 'cause I don't
10   know what happened.
11       MS. CASTLE:  Okay.
12       MR. PONTIKES:  He didn't have an extra one for
13   me before.  All right, it's coming on now.
14       MS. CASTLE:  Okay.
15       MR. PONTIKES:  Am I in the -- I'm not in this,
16   right?  Okay.
17       MS. CASTLE:  Okay.  Well, we'll take a look at
18   that in a little bit.  It should have already been
19   queued up, but...
20       MR. PONTIKES:  Hold on one second.  Let me get
21   this.
22       MS. CASTLE:  Okay.
23            (WHEREUPON, there was a short
24            interruption.)

40

1        MS. CASTLE:  Okay.  Here you go.
2    BY MS. CASTLE:
3        Q.   We're going to take a look --
4        MR. PONTIKES:  Thanks.  These are my copies or
5    --
6        MS. CASTLE:  That's yours.
7    BY MS. CASTLE:
8        Q.   We're going to take a look at a set of
9    four documents that have been previously marked as
10   Plaintiffs' Exhibit 7A, 7B, 7C, and 7D.  Now, I'm
11   going to represent to you that these are four
12   photographs taken, pictures of four sides of one of
13   these two boxes.  So these aren't -- they're four
14   separate photographs photographing four sides.
15       MR. PONTIKES:  Same boxes.
16   BY THE WITNESS:
17       A.   Oh, okay.  Same boxes.
18   BY MS. CASTLE:
19       Q.   Right.  So we're just taking pictures of
20   every side of the box.
21       A.   Okay.
22       Q.   Have you ever seen either of these boxes
23   before?
24       A.   No.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

41

1    Q.  No.
2       Have you ever seen the one on the left
3  that says "TOP"?  Do you see that one?
4    A.  No.
5    MR. PONTIKES:  He sees it, but he hasn't seen
6  it.  He sees it in your exhibit --
7    THE WITNESS:  That's what she's asking, right?
8  BY MS. CASTLE:
9    Q.  Yeah, let's back up.
10      So have you ever seen -- if you look at
11  7B, have you ever seen the box on the left?
12    A.  No.
13    Q.  Okay.  We can move on.
14    MR. PONTIKES:  All right.  This thing isn't
15  keyed, so those are done.  You can put them down.
16  I'm not real computer literate.  How do you start it
17  up, then?
18    MS. CASTLE:  Okay.
19    MR. PONTIKES:  'Cause there's nothing on it
20  right now.
21    MS. CASTLE:  Okay, let -- you know what, let's
22  ask a few more questions, and then we can take a
23  break maybe in about 15, 20 minutes or so and then I
24  can work with the laptop.

42

1  BY MS. CASTLE:
2    Q.  Okay?
3    A.  Okay.
4    MS. CASTLE:  So you might want to leave the
5  screen on so that -- we don't want to turn it off or
6  anything.  Okay.
7  BY MS. CASTLE:
8    Q.  So just asking you a question.  I have --
9  I have a picture of how your gas station, Clark Gas
10  and Food, looks.
11    MR. PONTIKES:  It's not IBM.
12    MS. CASTLE:  Yeah.  No, I gotcha.
13  BY MS. CASTLE:
14    Q.  So when a customer comes in, they ask you
15  to purchase a packet of TOP cigarette rolling
16  papers?
17    A.  That's right.
18    Q.  Okay.  And you just hand them a packet?
19    A.  That's right.
20    MR. PONTIKES:  After they pay.
21  BY MS. CASTLE:
22    Q.  After they pay?
23    A.  Right.
24    Q.  I'm -- do they typically pay in cash?

43

1    A.  Yes.
2    Q.  Okay.
3    MR. PONTIKES:  Neither you nor I should be in
4  that area at any point in time.  He provides a
5  service.
6    THE WITNESS:  But you can go in the daytime.
7  BY MS. CASTLE:
8    Q.  So I guess my question for you, then, is
9  how do you keep track of how much money you're
10  making?  If you're -- you know, if you're receiving
11  cash from most of your customers and you're paying
12  for purchases in cash, how do you keep track of your
13  profits and losses?
14    A.  We have a register there.  You ring into
15  the register.
16    MR. PONTIKES:  You ring into the register.
17  BY MS. CASTLE:
18    Q.  Okay.
19    A.  So then whole day what you sell it, what
20  you bought it.
21    Q.  Okay.
22    A.  So end of the week, end of the month, so
23  if you can figure out which way you're going.
24    MR. PONTIKES:  Right.

44

1  BY MS. CASTLE:
2    Q.  So what do you do at the end of the day?
3  Does it -- does the register spit out some sort of
4  report or --
5    A.  Yeah.  You could take the you, know,
6  daily report, you know, how much is the sale per
7  day.
8    MR. PONTIKES:  Right.
9  BY MS. CASTLE:
10    Q.  And then what do you do with the daily
11  report?  Do you like file them or --
12    A.  We keep them for a while, then, you know,
13  just you maintain it, you know.  Are you losing
14  money?  Are you making money?  Which way you going?
15    Q.  And then do you also do this at the end
16  of the month?  Or how often do you run these
17  reports; daily and then --
18    A.  You can do end of the month too, but
19  there's so many mistakes happen.  So at the end of
20  the month you take the report sometime, you know,
21  you go millions, millions, dollar.  You know, when
22  cashier makes mistakes, you know, instead of ringing
23  like, you know, $30, 20, something, $120, then
24  divide it.  Sometime you, know, they ring it,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

45

1  open it. So but, you know, they correct it, but
2  mistake happen. But it's keep coming to the report,
3  you know, so you cannot go end of the month
4  reporting usually.
5      Q.  Do you then compare your people -- you
6  know, your purchases, people who purchase from you,
7  your incoming cash flow versus what you're spending
8  on products?
9      A.  Right.
10     Q.  How do you keep track of that?
11     A.  You know, let's see, for whole month you
12  bought a hundred dollars, so if you have a
13  15 percent markup, you're supposed to sell 115 or
14  120. If you -- you -- if you're coming in that
15  range, you okay. So if you buying stuff and selling
16  less, that means there's stuff going on.
17     Q.  So is this just something that you keep
18  track of in your head, or how do you keep -- could
19  you keep track of it on paper?
20     A.  Vendor comes to you, you know, you buy
21  every -- the vendors comes there, you know, like
22  chips, soda, Pepsi, everybody. You keep those
23  invoices for the whole month, how much you bought
24  it, how much you sell it.

46

1      Q.  Okay. So your -- you keep the invoices
2  from the different vendors?
3      A.  Right.
4      Q.  Okay. Do you also maintain -- do you
5  maintain bank accounts?
6      A.  Yes.
7      Q.  Okay. Do you maintain your bank
8  statements from the bank accounts?
9      A.  Yes.
10     Q.  Okay. Where do you maintain your bank
11  accounts?
12     MR. PONTIKES: I'm going to object. He's not
13  going to answer this. That's not suitable at this
14  point. It has nothing to do with the case. I'm
15  going to instruct him not to answer. You can ask
16  him just what you did, I have no problem with that,
17  but we're not getting into bank accounts or bank
18  account numbers or banks.
19     MS. CASTLE: Are you instructing him not to
20  answer?
21     MR. PONTIKES: That was part of the initial --
22  my objections to discovery to begin with.
23     MS. CASTLE: On what basis are you instructing
24  him not to answer?

47

1      MR. PONTIKES: It violates confidentialities
2  and it's not discoverable, nor is it intended to
3  lead to anything discoverable in this case. He's
4  already talked about TOP, how he buys that, which I
5  had no problems with. This is getting into an area
6  which I don't think is discoverable, nor should it
7  be discoverable.
8      MS. CASTLE: Based on --
9      MR. PONTIKES: The Judge decides how that
10  works.
11     MS. CASTLE: Based on -- I'm just trying to
12  figure out the basis --
13     MR. PONTIKES: Based on relevancy.
14     MS. CASTLE: -- for your instruction.
15     MR. PONTIKES: In large part, yeah.
16     MS. CASTLE: Okay. So let me just understand
17  that you're instructing your client not to answer
18  based on relevancy grounds?
19     MR. PONTIKES: Exactly. Relevancy and
20  admissibility and everything which would be
21  discoverable in this deposition.
22     MS. CASTLE: Okay, but you realize this is a
23  discovery deposition?
24     MR. PONTIKES: I realize it totally, Counsel.

48

1  Thanks.
2      MS. CASTLE: Okay. And you're instructing your
3  client not to answer based on relevancy grounds?
4      MR. PONTIKES: For the second time now.
5  BY MS. CASTLE:
6      Q.  And are you going to follow your
7  Counsel's advice?
8      MR. PONTIKES: Yes, he is. You can answer yes.
9  BY MS. CASTLE:
10     Q.  You're not going to answer?
11     A.  No.
12     Q.  Okay. Do you -- I'm going to ask you
13  first about you personally, and I'm going to ask you
14  about your company, South Chicago One. And just so
15  we have a clear record --
16     MR. PONTIKES: Sure. Go ahead.
17  BY MS. CASTLE:
18     Q.  -- do you -- you personally have bank
19  accounts, correct?
20     MR. PONTIKES: You can answer yes.
21  BY THE WITNESS:
22     A.  Yes.
23     MR. PONTIKES: Okay.
24



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

49

1   BY MS. CASTLE:
2       Q.   And your company, South Chicago One, has
3   separate bank accounts?
4       A.   Yes.
5       Q.   And you personally maintain your bank
6   statements from your bank?
7       A.   Yes.
8       Q.   And you also maintain the bank statements
9   from South Chicago One?
10      A.   Yes.
11      Q.   And --
12      MR. PONTIKES:   I mean -- objection.  As I
13  stated before, an instruction that he's not going to
14  answer anything about individual bank accounts or
15  where he does his banking at.
16      MS. CASTLE:   Okay.
17      MR. PONTIKES:   I mean, you can ask him just
18  what you did before, and everything is fine that you
19  asked him up to this point.  I just don't think that
20  it leads to anything discoverable --
21      MS. CASTLE:   I'm going to ask him --
22      MR. PONTIKES:   -- but we can agree to disagree.
23      MS. CASTLE:   Okay.  I'm going to ask -- I'm
24  going to ask him if you choose to follow your

50

1   Counsel's instruction --
2       MR. PONTIKES:   Which he will.
3       MS. CASTLE:   Okay.
4   BY MS. CASTLE:
5       Q.   So do you know the names of your bank
6   account -- of your banks, your personal banks and
7   your bank for South Chicago One?
8       MR. PONTIKES:   Don't state the names, just do
9   you know the names?
10      THE WITNESS:   Do --
11      MR. PONTIKES:   Yeah, you can tell her -- if you
12  know names, yes, but you're not going to say what
13  names they are.
14  BY THE WITNESS:
15      A.   Yeah, I know.
16      MR. PONTIKES:   Okay.
17  BY MS. CASTLE:
18      Q.   And do you have the bank -- do you have
19  bank statements from those banks?
20      A.   Yes.
21      Q.   Okay.  Do you file -- do you personally
22  file tax returns?
23      A.   I do.
24      Q.   Does South Chicago One file tax returns?

51

1       A.   Yes.
2       Q.   Do you have an accountant prepare those
3   tax returns?
4       A.   Yes.
5       Q.   Do you maintain records of your old tax
6   returns?
7       A.   Yes.
8       Q.   Who is the accountant who prepares your
9   tax returns?
10      MR. PONTIKES:   He's not -- he's not going to
11  identify those.  Once again, this was objected to in
12  discovery.  We're going to object.  At the same
13  time, I'm going to instruct him not to answer based
14  on relevancy, admissibility.  And although -- just
15  for the depositions such as this are far-reaching, I
16  don't believe they reach this far.  We've already
17  objected and indicate that he's provided answers
18  relevant to TOP Tobacco as was posed.  He's not
19  going to get into these, and he's not going to
20  answer any of these questions or this line.  I'm
21  instructing him not to answer.
22  BY MS. CASTLE:
23      Q.   Do you follow your Counsel's instruction?
24      A.   Yes.

52

1       Q.   Okay.  We're going to come back to that
2   in a little bit.
3           I want to just talk a little bit about
4   your relationship with some of the other defendants
5   in this case.  I asked you earlier if you were
6   related to Mr. Nusrat Choudhri and you said no.
7       A.   No.
8       Q.   Do you know Mr. Nusrat Choudhri?
9       A.   Peers.
10      Q.   You know him -- when did you first meet
11  him?
12      A.   I believe 8, 9 years ago.
13      Q.   And how did you come to meet
14  Mr. Choudhri?
15      A.   Just happen that he's in same business.
16      Q.   Did you meet him at Midwestern Cash and
17  Carry, LLC?
18      A.   I was buying cash and carry for long
19  time, you know, before even they were there.
20      Q.   So --
21      A.   I'm shopping Cash and Carry since '97.
22      Q.   Okay.
23      MR. PONTIKES:   He's saying he brought from Cash
24  and Carry before, and he knows --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                        February 20, 2012

53

1    MS. CASTLE: I understand, yeah.
2    BY THE WITNESS:
3        A.   Then they come in the picture, you know.
4    BY MS. CASTLE:
5        Q.   So you met him when he purchased
6    Midwestern Cash and Carry?
7        MR. PONTIKES: He said he knew him from before
8    then.
9    BY THE WITNESS:
10       A.   No, I met before.
11   BY MS. CASTLE:
12       Q.   Oh. How did you meet him before then?
13       A.   I think my daughter was born, you know,
14   so somebody introduced me, he came to, you know, say
15   "Hi," about 9 or 10 years ago, 8 or 9 years ago.
16       Q.   So you met him through friends?
17       A.   Through friends.
18       Q.   Okay. So it wasn't a business --
19       A.   No, no, no.
20       Q.   -- relationship?
21           You met as personal acquaintances first?
22       A.   As personal acquaintances.
23       Q.   Okay. Do you still have a friendly
24   relationship with Mr. Nusrat Choudhri?

54

1        A.   Yeah.
2        Q.   How often do you guys talk?
3        A.   Whenever we meet.
4        Q.   How often do you meet?
5        A.   Once in a while, you know.
6        Q.   Every day?
7        A.   No, no.
8        Q.   Every week?
9        A.   Yeah. Maybe once a month, twice a month.
10       Q.   Do you talk about business or other
11   personal matters?
12       A.   No, he has -- you know, he has a kid, I
13   have a kids, you know. Not -- not business, you
14   know.
15       Q.   So is it fair to say that you and
16   Mr. Nusrat Choudhri are friends?
17       A.   You can say that.
18       Q.   Okay. Have you ever talked to Mr. Nusrat
19   Choudhri about this case?
20       A.   No. Just I come to know my name was
21   there, so that's how I, you know, find out, you
22   know.
23       Q.   So when did you first talk to Mr. Nusrat
24   Choudhri about this case?

55

1        A.   I think few months back when they told my
2    name is there. I said, "For what?" They said
3    something, you know.
4        Q.   Have you spoken to him since about this
5    case?
6        A.   Well, no. I know, you know, then I say,
7    "My name is there so, you know, I cannot afford it,"
8    you know.
9        Q.   And what did he say?
10       A.   He said, "No problem." You know, "Your
11   name is there. There's another people name, too,"
12   you know, so.
13       Q.   So is he paying for your attorney?
14       MR. PONTIKES: Objection. And he's not going
15   to answer where the money comes from to pay the
16   attorneys. It's none of your business. Attorney --
17   you're not going to answer.
18       MS. CASTLE: I disagree, but --
19       MR. PONTIKES: That's fine. He's not
20   answering.
21   BY MS. CASTLE:
22       Q.   Do you pay for your attorney's fees?
23       MR. PONTIKES: And I'm instructing him not to
24   answer. You're not answering.

56

1        MS. CASTLE: Well, he can answer. That's not
2    privileged.
3        MR. PONTIKES: He can't.
4        MS. CASTLE: It's not privileged.
5        MR. PONTIKES: I'm instructing him not to
6    answer it.
7        MS. CASTLE: Based on what?
8        MR. PONTIKES: It's totally irrelevant. I'm
9    representing him. That's all you need to know.
10       MS. CASTLE: I mean, I can get into why I think
11   it's relevant. I don't think you want that on the
12   record.
13       MR. PONTIKES: Sure. He's not going to
14   answer it.
15       MS. CASTLE: Based on privilege. How is that
16   privileged?
17       MR. PONTIKES: Because it's between
18   attorney/client.
19       MS. CASTLE: Whether he pays you or not?
20       MR. PONTIKES: Mm-hmm.
21       MS. CASTLE: How is that privileged?
22       MR. PONTIKES: And it's -- and it's irrelevant
23   to the lawsuit. How is it relevant?
24       MS. CASTLE: Because we are alleging that they

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Bashir Chaudry                                          February 20, 2012

57

1  are all related and have related entities.
2       MR. PONTIKES: Well, that's not part of what
3  you're alleging, but that's fine. There's no
4  conspiracy. He's not answering it, so ask him if
5  he's going to answer it, and he's going to tell you
6  no.
7       MS. CASTLE: And you're instructing him not to
8  answer based on privilege?
9       MR. PONTIKES: For the third time.
10      MS. CASTLE: I'm going to ask Mr. Chaudry a
11 question. You're free to instruct him not to
12 answer, if you would like to, but I'm going to ask
13 the questions.
14      MR. PONTIKES: Go ahead.
15 BY MS. CASTLE:
16      Q.   So do you pay for your attorney here?
17      MR. PONTIKES: He's not answering it. You're
18 not answering it based on my advice. You're not
19 answering it.
20      THE WITNESS: Okay.
21 BY MS. CASTLE:
22      Q.   Are you taking your client's -- are you
23 taking your Counsel's advice?
24      A.   Yes, mm-hmm.

58

1       Q.   Okay. Do you know who is paying for your
2  attorney's fees in this case?
3       MR. PONTIKES: You're not answering. I'm
4  instructing you not to answer. You're not answering
5  it upon my advice.
6       THE WITNESS: Okay.
7  BY MS. CASTLE:
8       Q.   Can you afford to pay for your attorney
9  in this case?
10      MR. PONTIKES: You're not answering it based on
11 my advice. You're not answering her questions.
12 BY MS. CASTLE:
13      Q.   How is --
14      MR. PONTIKES: -- as to --
15      MS. CASTLE: Hold on. I just asked a specific
16 question. You can't just blanketly object to every
17 question.
18      MR. PONTIKES: Sure, I can. I'm doing it right
19 now.
20      MS. CASTLE: That's fine. If you want to
21 instruct him not answer, but I asked a question that
22 didn't -- it's not going to elicit any sort of
23 privileged response. I'm not looking --
24      MR. PONTIKES: In your opinion.

59

1       MS. CASTLE: -- for privileged information.
2       MR. PONTIKES: In your opinion.
3       MS. CASTLE: How is whether he can afford to
4  pay for his attorney's fees privileged?
5       MR. PONTIKES: We'll let the Judge decide.
6  My -- my objection is, it's, first of all,
7  irrelevant, number one. Number two, it doesn't go
8  to anything discoverable. Number three, there's no
9  grandiose conspiracy.
10      You're not answering it based on my
11 advice.
12 BY MS. CASTLE:
13      Q.   And are you taking your attorney's
14 advice?
15      A.   Yes.
16      Q.   Okay. Let me just get an understanding
17 of your relationship with Mr. Nusrat Choudhri.
18      You've been friends for the last 8 to 9
19 years?
20      MR. PONTIKES: Asked and answered.
21      MS. CASTLE: I know.
22      MR. PONTIKES: You've asked him this before.
23      MS. CASTLE: That's right. I'm trying to get a
24 better understanding of his relationship so I'm

60

1  going back and I'm re --
2       MR. PONTIKES: He's not going to change his
3  answer.
4       MS. CASTLE: I'm not asking him to change
5  answers. I'm going back and I'm recapping so I can
6  better understand the testimony in the transcript
7  here. Thanks.
8       MR. PONTIKES: Go ahead, but he's not going to
9  continue to answer questions that were answered --
10 that were asked and answered.
11      MS. CASTLE: Well, if you're going to instruct
12 him not to answer that question based on asked and
13 answered, then you can go ahead and do that.
14      MR. PONTIKES: All right. Don't answer it
15 based on asked and answered. Go ahead.
16      MS. CASTLE: Okay. You're going to have one
17 heck of a motion to compel with Judge Guzman.
18      MR. PONTIKES: That's fine.
19      MS. CASTLE: And that's fine. You can answer
20 to that.
21      MR. PONTIKES: You can only ask him the same
22 question so many times. Go ahead.
23      MS. CASTLE: Okay. I can actually ask him as
24 many times as I want.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

61

1     MR. PONTIKES: I disagree, but go ahead.
2     MS. CASTLE: Okay. Well, we'll let Judge
3  Guzman decide that.
4  BY MS. CASTLE:
5     Q.  You and Mr. Choudhri have been friends
6  for the past 8 or 9 years?
7     A.  Approximately.
8     MR. PONTIKES: Objection. Asked and answered.
9  This is the third time you asked him. He said "yes"
10 again.
11    MS. CASTLE: Yes. You keep objecting and I
12 actually cannot get my full question out.
13    MR. PONTIKES: He just answered again.
14    MS. CASTLE: I'm not asking him. That's not my
15 question. I'm recapping. It's called summary. I'm
16 summarizing --
17    MR. PONTIKES: Well, you may summarize, but he
18 thinks you're asking a question, Counsel.
19 BY MS. CASTLE:
20    Q.  Do you think I'm asking you a question or
21 do you think I'm summarizing?
22    A.  That last part -- I'll try to. Now I
23 understand so I didn't know that --
24    Q.  Okay. All right. I'm going to go back

62

1  and I'm going to summarize your testimony.
2     A.  Okay.
3     Q.  And you tell me if I have -- if I'm
4  misunderstanding your testimony. Okay?
5     A.  Okay.
6     MR. PONTIKES: Counsel, but he's not here to
7  tell you whether you're summarizing it correctly.
8  Just go ahead and do it. Let's just move on. I
9  know we're almost to the end. I'm not feeling
10 well --
11    MS. CASTLE: We're not actually to the end. We
12 have some more to cover so.
13    MR. PONTIKES: That's fine. Just go ahead.
14 BY MS. CASTLE:
15    Q.  You and Mr. Nusrat Choudhri have been
16 friends for the past 8 or 9 years. You were
17 purchasing from Midwestern Cash and Carry, LLC
18 before you were friends with Nusrat Choudhri; is
19 that correct?
20    A.  Yes.
21    MR. PONTIKES: Now it's a question. All right.
22 His answer is "yes." You were summarizing before,
23 and now I take it that was a question.
24    MS. CASTLE: That is -- right. That was my

63

1  question.
2     MR. PONTIKES: He's testified to this three
3  times, now asked and answered, and now he testified
4  "yes" again. All right.
5     MS. CASTLE: Yes.
6  BY MS. CASTLE:
7     Q.  My understanding is correct?
8     A.  Correct.
9     Q.  Okay. Thank you.
10       Do you also know Sabra Choudhri?
11    A.  Yes.
12    Q.  How do you know Sabra Choudhri?
13    A.  That's his wife.
14    Q.  How long have you known Sabra Choudhri?
15    A.  The same, you know.
16    Q.  Are you friends --
17    A.  Since we know him.
18    Q.  Are you friends with Sabra Choudhri?
19    A.  No, I met him, you know, then she came
20 later on.
21    Q.  You know, actually, there's another
22 question I wanted to ask you about Nusrat.
23       Do you have any sort of business
24 relationship with Mr. Nusrat Choudhri?

64

1     A.  No.
2     Q.  Okay. You don't own any businesses with
3  him?
4     A.  No.
5     Q.  He doesn't have any interests in any of
6  your business?
7     A.  No.
8     Q.  Okay. Do you know Mr. Muzafar Ali?
9     A.  I know Muzafar, but I don't know his last
10 name is Ali.
11    MR. PONTIKES: If you don't know that's the
12 same person, don't guess or speculate.
13 BY THE WITNESS:
14    A.  Right.
15 BY MS. CASTLE:
16    Q.  So you know someone named Muzafar, but
17 you don't know if it's Muzafar Ali?
18    A.  Right.
19    Q.  Okay. Do you know a Mr. Zubair Khawaja?
20    A.  Yes.
21    Q.  And how do you know him?
22    A.  Mr. Khawaja, I know him for, you know,
23 long time, before even.
24    Q.  How long have you known him?


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

65

1    A.   About 15 years, maybe.
2    Q.   And how -- how do you -- how do you know
3  him?
4    A.   We -- he used to own restaurant. I used
5  to own a restaurant, so he worked with me.
6    Q.   Did he work for you?
7    A.   Yeah. First he worked for with me, then
8  he become a small shareholder with me.
9    Q.   Okay. What restaurant was that?
10   A.   It's a fast food restaurant on south
11 side.
12   Q.   Okay. What was the name of it?
13   A.   Ali Sub.
14   Q.   Ali Sub?
15   A.   Yeah. It used to be Ali for Ali -- for
16 Muhammad Ali, boxer.
17   MR. PONTIKES: Oh, Muhammad Ali, the boxer.
18 You got that, right?
19 BY THE WITNESS:
20   A.   Yeah.
21      So he sold it to some Korean people, and
22 I took it from them.
23 BY MS. CASTLE:
24   Q.   Do you -- do you still talk to

66

1  Mr. Zubair?
2    A.   Once a year. If he meet somewhere,
3  "Hello. Hi," you know.
4    Q.   Do you have any business with him today?
5    A.   No.
6    Q.   Okay. Are you familiar with a company --
7  a gas station called Yale Gas and Food?
8    A.   No.
9    Q.   Are you familiar with a company called
10 Southern Gas and Food?
11   A.   No.
12   Q.   Okay. Okay. All right.
13   MS. CASTLE: At this time, I think we should
14 just take a quick break and see if this video is up
15 and running.
16   MR. PONTIKES: Go ahead. We'll wait.
17   MS. CASTLE: All right. Could we go off the
18 record, please.
19   THE VIDEOGRAPHER: Going off the video record
20 at 1:29 p.m. This is the end of Tape Number 1.
21      (WHEREUPON, a recess was had.)
22   THE VIDEOGRAPHER: Going back on the video
23 record at 1:38 p.m. This is the beginning of Tape
24 Number 2.

67

1  BY MS. CASTLE:
2    Q.   Okay. Mr. Chaudry, I just want to ask
3  you a few questions. Before the break we were
4  talking about your relationship with Mr. Nusrat
5  Choudhri.
6       Do you know whether Midwestern Cash and
7  Carry, LLC has ever been accused of selling
8  counterfeit products in the past?
9    A.   No.
10   Q.   Okay. Have -- have you ever been accused
11 of selling counterfeit products?
12   A.   No.
13   Q.   Have any of your businesses ever been
14 accused of selling counterfeit products?
15   A.   No.
16   Q.   Do you know a Mr. Arnulfo Vargas?
17   A.   Yeah. The -- I think, if I'm not wrong,
18 there was two or three brother at Cash and Carry
19 before. They run it.
20   Q.   Okay. Do you know a Mr. Arif Syed?
21   A.   Arif, yeah. He's -- he work there in the
22 counter.
23   Q.   At Midwestern Cash and Carry --
24   A.   Right.

68

1    Q.   -- LLC?
2    A.   Right.
3    Q.   Okay. Do you know Mr. Jamal Khalid?
4    A.   No.
5    MS. CASTLE: At this time, I just want to mark
6  Plaintiffs' Exhibit, I think we're on 34.
7    MR. PONTIKES: What's this 34? The Answers?
8       (WHEREUPON, a certain document was
9       marked Plaintiffs' Exhibit No. 34,
10      for identification, as of this
11      date.)
12      (WHEREUPON, the document was
13      tendered to the witness.)
14 BY MS. CASTLE:
15   Q.   Mr. Chaudry, have you seen this document
16 before? Take a look at it and -- you know, actually
17 if you unclip it, there's actually --
18   MR. PONTIKES: You have more than that.
19   MS. CASTLE: There's actually two documents,
20 yeah. This was how it was produced to us, but
21 there's actually two sets of documents.
22   MR. PONTIKES: How do you want to handle it?
23   MS. CASTLE: Let's mark the Interrogatories,
24 which is the top document, as Exhibit 34, and --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

69

1       MR. PONTIKES: The production is 35?
2       MS. CASTLE: Correct.
3   BY MS. CASTLE:
4       Q.   Mr. Chaudry, if I could just take those
5   documents back from you for a second. No, the other
6   ones.
7       A.   This one?
8       Q.   Yeah.
9       MS. CASTLE: And we're going to mark -- have
10  the court reporter mark Responses to Plaintiffs'
11  Request For Production of Documents as Plaintiffs'
12  Exhibit 35, and your document production that we
13  received with your responses of doc requests,
14  they're also going to be Exhibit 35.
15      MR. PONTIKES: That's a group exhibit.
16      MS. CASTLE: Yeah.
17          (WHEREUPON, a certain document was
18          marked Plaintiffs' Exhibit No. 35,
19          for identification, as of this
20          date.)
21          (WHEREUPON, the document was
22          tendered to the witness.)
23  BY MS. CASTLE:
24      Q.   So I ask you to take a look at

70

1   Exhibit 34, which are Defendants' Answers to
2   Plaintiffs' Interrogatories.
3       MS. CASTLE: She marked them, yeah.
4   BY MS. CASTLE:
5       Q.   So look at 34. Have you ever seen this
6   document before, Mr. Chaudry?
7       A.   I think so.
8       MR. PONTIKES: Yeah.
9   BY MS. CASTLE:
10      Q.   Do you recall reviewing Exhibit 34?
11      A.   No. I see like name over here, but I'm
12  not sure it's same thing or --
13      Q.   Well, take a look at -- we have questions
14  here and then there's answers below.
15          So do you recall seeing this document
16  where we asked questions and then there's answers
17  below?
18      MR. PONTIKES: And then we put your answers in.
19  That's what she's asking.
20  BY MS. CASTLE:
21      Q.   I'm looking at Exhibit 34.
22      A.   This one?
23      Q.   Yep.
24      A.   This answer is mine.

71

1       Q.   Okay.
2       MR. PONTIKES: Right.
3   BY MS. CASTLE:
4       Q.   So you've -- you've reviewed this
5   document before?
6       A.   Yes.
7       Q.   Okay. So if you could just look at your
8   answer to question number 1.
9       A.   Okay.
10      Q.   You mention a Mr. Azad A. Rafiq?
11      A.   Right.
12      Q.   Is this who you referenced earlier --
13      A.   Right.
14      Q.   -- in the deposition?
15      A.   Yes.
16      Q.   Okay. And did he help you prepare your
17  answers to these interrogatories?
18      A.   Correct.
19      Q.   Okay. And what does he do for you,
20  Mr. Azad?
21      A.   He work with me.
22      Q.   What -- what are his responsibilities?
23      A.   When I'm not there, he's in, you know, he
24  look after.

72

1       Q.   So is he like a -- a manager?
2       A.   You can say assistant manager.
3       Q.   Assistant manager?
4       A.   Yes.
5       Q.   Okay. I want to skip to question number
6   5, or Interrogatory Number 5. It's on Page 2. And
7   in your answer you say that you purchased tobacco
8   products from Dearborn Wholesale and vendors and
9   sold as a routine sale.
10      A.   Right.
11      Q.   What vendors are you referring to here?
12      A.   Vendors, like, you know, Hostess comes,
13  chips comes, soda people comes, so we call all those
14  vendors.
15      Q.   Yes. The question is asking you, though,
16  to identify, you know -- go ahead. We can read the
17  question.
18      A.   Okay.
19      Q.   Question 5 says: "Identify and describe
20  with particularity each and every channel of trade
21  through which you have sold, offered to sell and/or
22  provided products, goods, or merchandise bearing or
23  in connection with the TOP Marks, the Paper Marks,
24  or the Tobacco and Tobacco Products Marks."



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

73

1    And your answer is: "I purchased the
2    tobacco products from Dearborn Wholesale and vendors
3    and sold as a routine sale."
4        So I'd like to know what other vendors
5    you're referring to.
6    A.   For the TOP or?
7    Q.   Yes.
8    A.   No. The TOP, I don't remember if you,
9    know, somebody comes, bring it over there. Usually
10   we buy it from, you know, Dearborn or --
11   Q.   Well, what other vendors? You're saying,
12   "and vendors." I -- I just don't know what you
13   mean.
14   MR. PONTIKES: Are you talking about Dearborn
15   as being another vendor?
16   MS. CASTLE: Yes. He listed Dearborn
17   Wholesale.
18   BY MS. CASTLE:
19   Q.   So what other vendors are you referring
20   to?
21   A.   No, vendors. When you say "vendor," you
22   know, usually we call everybody vendor, you know,
23   whoever bring the --
24   Q.   Right. And I'm asking, who are they?

74

1    What are their names?
2    A.   You know, like, you know, chips comes,
3    we call vendors.
4    MR. PONTIKES: No, she's just talking about
5    rolling papers.
6    MS. CASTLE: Yes.
7    MR. PONTIKES: That's probably what was
8    confused to begin with, then he gave his answer.
9        She just wants to know, who -- who else besides
10   Dearborn did you buy rolling papers from?
11   BY THE WITNESS:
12   A.   Rolling paper, I don't remember, you
13   know. Somebody sell it over there. You know, on
14   the -- on the location. Usually we buy discount,
15   you know. There's Lawrence Discount and from
16   Dearborn and sometime Cash and Carry.
17   MR. PONTIKES: Same thing he said before.
18   BY MS. CASTLE:
19   Q.   Okay. So if we can take a look at
20   Interrogatories 7 and 8, and just read those to
21   yourself. I don't need to read those, but they're
22   asking you for your annual purchases by volume,
23   source, brand, and year; and your annual sales by
24   volume, source, brand, and year.

75

1        Do you see that?
2    A.   Yes.
3    Q.   Okay. So --
4    MR. PONTIKES: Excuse me.
5    BY MS. CASTLE:
6    Q.   -- I just want to ask, how did you come
7    up with these numbers?
8    A.   Okay. Usually one box has like 24
9    pieces, so those two boxes we sell it, you know, one
10   week or, you know, like, you know, 24 pieces. So we
11   come up, you know, number of the items multiply
12   price and --
13   Q.   So what do you sell TOP cigarette rolling
14   -- what do you sell one packet of TOP cigarette
15   rolling papers for?
16   MR. PONTIKES: I think before he told you, but
17   go ahead. I think he said a dollar.
18   BY THE WITNESS:
19   A.   Used to be a dollar, now I think 1.25.
20   BY MS. CASTLE:
21   Q.   You mean that's your markup?
22   A.   Right.
23   MR. PONTIKES: Well, no, you asked him what he
24   sold them for.

76

1    BY THE WITNESS:
2    A.   Right. That's what I sell it.
3    BY MS. CASTLE:
4    Q.   You sell, right, the individual packets
5    for a dollar to $1.25?
6    A.   Yeah. Used to come like $15. We were
7    selling $1. Now I think it's coming, 18, $19. We
8    sell $1.25.
9        (WHEREUPON, there was a short
10           interruption.)
11   BY MS. CASTLE:
12   Q.   Okay. Have you always sold it at that
13   price?
14   A.   Yeah.
15   Q.   A dollar to a $1.25?
16   A.   Right.
17   Q.   Okay. Okay. And so just so I understand
18   you correctly, you came up with your answers to
19   Interrogatory 7 and 8 just by multiplying the price
20   that you pay for the products?
21   A.   Right.
22   Q.   Divided by the amount of booklets in a
23   box?
24   A.   Yeah. Approximately, yeah.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

77

1  Q.  So you didn't actually have any sort of
2  -- you don't have any papers showing these sales
3  figures --
4  A.  No.
5  Q.  -- correct?
6  A.  No.
7  MR. PONTIKES:  He --
8  BY MS. CASTLE:
9  Q.  This is math you did in your head?
10  A.  Right.
11  Q.  Okay.
12  MR. PONTIKES:  He didn't have the actual
13  invoices, just approximates.
14  MS. CASTLE:  Okay.
15  BY MS. CASTLE:
16  Q.  Let's take a look at Exhibit 35, so
17  that's the other exhibit.  Your responses to doc
18  requests.
19  A.  35, yes.
20  Q.  Yes.  And that came also, it's a group
21  exhibit, so you might want to clip them together so
22  you don't lose them.  It's the doc request and then
23  all those documents.  Yeah.
24  So tell me when you have those all

78

1  together.  Okay.
2  You ready?
3  A.  Mm-hmm.
4  Q.  Okay.  So if you could take a look at the
5  first invoice, and it's from Dearborn Wholesale,
6  dated 1/17/11, correct?
7  A.  Right.
8  Q.  And it just says in the middle column, it
9  says, next to "TOP Paper," if you go next to "TOP
10  Paper" --
11  A.  Mm-hmm.
12  Q.  -- it says "24."
13  A.  Right.
14  Q.  So is that the number of booklets you
15  purchased?
16  A.  In one box, 24 booklets.
17  Q.  Okay.  So that's -- you bought -- and on
18  this receipt -- on this invoice, you bought two
19  boxes?
20  A.  Right.
21  Q.  I just want to make sure I
22  understand.
23  Now, did you gather --
24  MR. PONTIKES:  On the next one if you notice,

79

1  they have four there.  I'm sorry.  Go ahead.
2  MS. CASTLE:  Okay.
3  BY MS. CASTLE:
4  Q.  Did you gather these documents?
5  A.  Yeah.  Azad helped me.
6  Q.  Azad helped you.
7  Did your attorney ask you to gather these
8  documents?
9  MR. PONTIKES:  Object.  Now you know not to ask
10  him that.  That's attorney-client privilege.  He's
11  not going to answer that.
12  (WHEREUPON, there was a short
13  interruption.)
14  MS. CASTLE:  Well, I just asked if it was --
15  MR. PONTIKES:  Well, you asked him if your
16  attorney told you to gather them, so that's
17  obviously improperly phrased.
18  MS. CASTLE:  Okay.  Let me -- let me rephrase
19  that.
20  BY MS. CASTLE:
21  Q.  Actually, let me back up.
22  MR. PONTIKES:  They were gathered as a request
23  in this case.  If you want to ask him that, I have
24  no problem with that.

80

1  MS. CASTLE:  Let me -- let me just back up
2  altogether.
3  BY MS. CASTLE:
4  Q.  Have you received any sort of -- has
5  anybody instructed you not to --
6  MS. CASTLE:  No, strike that.
7  BY MS. CASTLE:
8  Q.  Has anybody instructed you to preserve
9  your documents in this case?
10  A.  Preserve?  What does mean "preserve"?
11  Q.  Meaning not to destroy your documents in
12  this case.
13  A.  No.  We keep it, you know, whatever we
14  have it.
15  Q.  Okay.  So you have -- any documents that
16  you have relating to this case, you've kept them?
17  A.  No.  Relating the case, usually we keep
18  it, you know, documents, you know, whatever we have
19  it, you know.
20  Q.  So anything relating to TOP or TOP
21  cigarette rolling papers, you have kept since this
22  lawsuit; is that correct?
23  A.  No, no.  It's, you know, whatever, buy,
24  that's the way it comes, so we keep it, the



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                              February 20, 2012

81

1    invoices.
2         MR. PONTIKES: He hasn't destroyed it.
3    BY THE WITNESS:
4         A.   Yeah, we don't destroy anything.
5    BY MS. CASTLE:
6         Q.   So you keep everything?
7         A.   We try.
8         MR. PONTIKES: Well, as much as he has.
9    BY THE WITNESS:
10        A.   Yeah, because you have to keep it, you
11   know, certain times.
12   BY MS. CASTLE:
13        Q.   Okay. When was the last time -- when was
14   the last time you made a purchase from Midwestern
15   Cash and Carry, LLC?
16        A.   No, recently I didn't go for a few months
17   because I had some health problems.
18        Q.   So when was the last time, if you can
19   recall? Like a month or a year?
20        A.   I think myself I didn't go almost 8 or
21   9 months.
22        Q.   What about anyone on your company's
23   behalf?
24        A.   Azad might went, you know. You know, my

82

1    -- my help, he might went over there.
2         Q.   When was the last time that he went
3    there? When was the last time South Chicago One
4    made a purchase from Midwestern Cash and Carry, LLC?
5         A.   I don't remember.
6         Q.   You don't know the last time your company
7    made a purchase from Midwestern Cash and Carry, LLC?
8         A.   No, I don't remember. Recently I've
9    been, you know, 4 or 5 months, I have some back
10   problems, so.
11        MR. PONTIKES: Okay, if you know, you know.
12   Don't --
13        MS. CASTLE: Well, it's a 30(b)(6) topic, so he
14   should be prepped on this.
15        MR. PONTIKES: Well, no, if he doesn't know, he
16   doesn't know. He's not going to make stuff up.
17        MS. CASTLE: He should have found out. That's
18   what a real 30(b)(6) deposition is.
19        MR. PONTIKES: Well, I disagree, but go ahead.
20   BY MS. CASTLE:
21        Q.   Do you recall the last time you purchased
22   TOP cigarette rolling papers from Midwestern Cash
23   and Carry, LLC?
24        MR. PONTIKES: Objection. He said he didn't

83

1    remember. Go ahead.
2    BY THE WITNESS:
3         A.   No, I don't remember, but especially with
4    TOP, because when you buy, you buy stuff like that.
5    You --
6         MR. PONTIKES: She's just asking if you
7    remember.
8    BY THE WITNESS:
9         A.   No, I don't remember.
10        MR. PONTIKES: If you don't, you don't.
11   BY MS. CASTLE:
12        Q.   How often do you purchase TOP cigarette
13   rolling papers?
14        A.   It's usually one to two box a week.
15   That means like 40, 45 pieces.
16        Q.   That's how much you buy or sell?
17        A.   That's what we sell.
18        Q.   Do you --
19        A.   So whenever -- whenever we go low and we
20   go buy it.
21        Q.   I'm sorry. I'm going to repeat my
22   question, and I need you to answer.
23        MR. PONTIKES: Wait 'til -- wait 'til she
24   finishes her question before you start answering.

84

1         THE WITNESS: Okay.
2    BY MS. CASTLE:
3         Q.   How many boxes of TOP cigarette rolling
4    papers do you purchase?
5         MR. PONTIKES: In what time?
6         MS. CASTLE: Every week.
7    BY THE WITNESS:
8         A.   About two. We sell at about two so we
9    keep it, you know, when it goes close to sell it, we
10   go buy another couple of.
11   BY MS. CASTLE:
12        Q.   Okay. So you sell about two per week?
13        A.   Approximately.
14        Q.   Two boxes worth?
15        A.   Approximately.
16        Q.   So when you're running low --
17        A.   Running low, you know, they can go pick
18   it up, you know. I can go pick it up, you know, but
19   recently I was not going.
20        Q.   Do you keep an inventory of TOP cigarette
21   rolling papers?
22        A.   No, we just bring it and put it on the --
23   in the front shelf.
24        MR. PONTIKES: You asked him that before. He



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

85

1    said no. But go ahead.
2        MS. CASTLE: I don't think I asked him that
3    question.
4        MR. PONTIKES: Yeah.
5    BY THE WITNESS:
6        A.   We put it on the shelf, two boxes. So
7    when it goes low, we buy another one.
8    BY MS. CASTLE:
9        Q.   Okay. So you don't keep any at your gas
10   station?
11       A.   No, no, no.
12       Q.   Okay. If you look to -- it's towards the
13   end of your packet and these aren't Bates labeled.
14       MR. PONTIKES: How far away from the back?
15       MS. CASTLE: I have no way of telling you.
16   BY MS. CASTLE:
17       Q.   It's actually at the top of the invoice,
18   it says, "Store phone 773" --
19       MR. PONTIKES: Is it Dearborn?
20       MS. CASTLE: I don't know. It's not labeled.
21       MR. PONTIKES: Well, no. What -- what does it
22   look like, so I can --
23       MS. CASTLE: It looks like --
24

86

1    BY THE WITNESS:
2        A.   487-5556?
3    BY MS. CASTLE:
4        Q.   Yeah, that's it.
5        MR. PONTIKES: Oh, you found it. What it is,
6    so I'm on it. That's okay. You don't have to take
7    it out.
8        MS. CASTLE: It's towards the end.
9    BY MS. CASTLE:
10       Q.   Is this an invoice from Dearborn
11   Wholesale?
12       MR. PONTIKES: What is it? 773-487-5656, is
13   that it?
14       MS. CASTLE: Yes.
15       MR. PONTIKES: Yeah, that's says Dear -- I
16   don't know if it's the one you're looking at, but on
17   another invoice it says "Dearborn." I didn't find
18   the one -- which one are you at, Sharyn?
19       MS. CASTLE: The one that you were just talking
20   about from store --
21   BY THE WITNESS:
22       A.   That's at Dearborn.
23   BY MS. CASTLE:
24       Q.   This is Dearborn?

87

1        A.   I think so, yeah.
2        MR. PONTIKES: On a different page, it says --
3    BY THE WITNESS:
4        A.   This one, right?
5        MR. PONTIKES: -- with that same number.
6    BY MS. CASTLE:
7        Q.   Okay. Let's just see what it says.
8        A.   This one, right?
9        Q.   Yes.
10       A.   Yes, this is Dearborn, because they carry
11   frozen food.
12       Q.   Okay. So this document is from Dearborn
13   Wholesale? This is an invoice from Dearborn
14   Wholesale?
15       A.   Right.
16       Q.   Okay. Let's move on to the next
17   document. So if you turn the page, you should have
18   a document that -- it looks like the first item is
19   Monster drink.
20       MR. PONTIKES: So that's at the end, right?
21   BY THE WITNESS:
22       A.   This one?
23   BY MS. CASTLE:
24       Q.   Nope. It should be right after the

88

1    invoice that we just looked at.
2        MR. PONTIKES: Oh, I see. It's right here.
3    BY MS. CASTLE:
4        Q.   Keep -- it's the next page.
5        MR. PONTIKES: Yeah, that's the one.
6    BY MS. CASTLE:
7        Q.   Yep, that's it. So it's this invoice,
8    and it starts -- the first item is Monster drink.
9            So where is this invoice from?
10       MR. PONTIKES: If you know, you know. If you
11   don't, you don't.
12   BY THE WITNESS:
13       A.   No, I don't remember.
14   BY MS. CASTLE:
15       Q.   You don't remember?
16       A.   No.
17       Q.   Okay.
18       MR. PONTIKES: He doesn't remember.
19   BY MS. CASTLE:
20       Q.   Do you -- where did you get this document
21   from?
22       A.   Azad help me out with the invoices, you
23   know. He's coming from our records, you know.
24       MR. PONTIKES: Yeah. And Sharyn, I don't know



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                                February 20, 2012

89

1  if this helps any, but it looks like it's the same
2  format as the next one which came from Lawrence.
3  I'm not sure, though.  You know what I mean, the
4  same format?  It might or might not be, but...
5  That's all right.  Let's go ahead.
6  BY MS. CASTLE:
7      Q.  So you don't know where you got this
8  invoice from?
9      A.  No.
10     Q.  Azad just found them in your records?
11     A.  Right.
12     Q.  Okay.  How did Azad look for these
13 documents?  How did he know to pull this document?
14     A.  We just keep it, you know, every month,
15 you know.  Every day, you know, we put invoices
16 together and end of the month, we put it together.
17     Q.  Well, why did -- why did you send us this
18 document?  Why did you give us this document?
19     A.  Because I think there is TOP rolling
20 paper there, that's why.  I told him to bring
21 everything, whatever the TOP, you have it.
22     Q.  Okay.  So let's then --
23     A.  The whole idea was to get our TOP Tobacco
24 and TOP Paper, anything, you know.

90

1      Q.  Well, take a look at the next page.  It's
2  an invoice from Lawrence Discount.
3      A.  Yeah.
4      Q.  Now, why was this document produced to
5  us?
6      A.  I'm sorry.  What's your question?
7      MR. PONTIKES:  Why did you give her --
8  BY MS. CASTLE:
9      Q.  Why did you give us this document?
10     A.  Because it says "cigar" over there, you
11 know.
12     Q.  Okay, but this doesn't have any purchase
13 for TOP cigarette rolling papers on it, right?
14     A.  Right, no.
15     Q.  Okay.  Let's turn the page and --
16     A.  I think it's midnight pouch there, you
17 know, That's why.  This have maybe pouch name.
18     Q.  Okay.  But there's no -- just to be
19 clear, there's no TOP cigarette rolling papers --
20     A.  No, they're not.
21     Q.  -- on this invoice?
22     A.  No.
23     Q.  Let's take a look at the next page, which
24 is an Item Sales Analysis Report dated 10/17/11 from

91

1  Midwestern Cash and Carry, LLC.
2      A.  Mm-hmm.
3      Q.  How did you get this document?
4      MR. PONTIKES:  Do you know how you got it?
5  BY THE WITNESS:
6      A.  Yeah.  I think we asked them, you know.
7  BY MS. CASTLE:
8      Q.  You asked him?
9      A.  Yes.  I think we asked them Cash and
10 Carry, you know, what kind of, you know, sale we
11 have which, you know.
12     MR. PONTIKES:  All right.
13 BY THE WITNESS:
14     A.  That's how I think they gave us.
15 BY MS. CASTLE:
16     Q.  So you asked Midwestern Cash and Carry,
17 LLC?
18     A.  Right.
19     Q.  Who did you ask, specifically?
20     A.  I think Arif.  There is guy name Arif.
21     Q.  Arif?
22     MR. PONTIKES:  Oh, okay.
23     You got that?  There's a guy named Arif?
24 Ms. Reporter?  Okay.

92

1  BY MS. CASTLE:
2      Q.  So you asked Arif for your purchase
3  history; is that correct?
4      A.  Right.
5      Q.  Okay.  So can we just take a look at --
6  do you see where the column that says "extended
7  price" on that document?
8      A.  This one?
9      A.  Yes.  The Item Sales Analysis Report from
10 Midwestern Cash and Carry, LLC.
11     MR. PONTIKES:  He's got it.
12 BY MS. CASTLE:
13     Q.  Are you looking at --
14     MR. PONTIKES:  No, no.  Let it.  See where it says
15 "extended price"?
16     THE WITNESS:  This one?
17     MR. PONTIKES:  Well, no.  Here, move --
18 "extended price of 29" or whatever.
19 BY THE WITNESS:
20     A.  Yeah, extended price.
21     MR. PONTIKES:  Then it's two count or whatever
22 it is.
23 BY MS. CASTLE:
24     Q.  Do you see where it says "29.90"?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                          February 20, 2012

93

1     A.   Right, 29.95?
2     MR. PONTIKES:  Actually, it says 29.90.
3   BY MS. CASTLE:
4     Q.   It says 29.90.
5     A.   Okay.
6     MR. PONTIKES:  29.90.  You see it?  No, no, no,
7   you're looking at the wrong one.
8     THE WITNESS:  This one?
9     MR. PONTIKES:  Go down.
10  BY THE WITNESS:
11    A.   29.90, right.
12  BY MS. CASTLE:
13    Q.   29.90.
14       Now, do you see "quantity"?  It says "2,"
15  right to the left of that?
16    A.   Right, 2.
17    Q.   Okay.  Does that mean that you bought two
18  boxes?
19    A.   Right, two boxes, 29.90.
20    Q.   So would that be about 14.95 each?
21    A.   Approximately.
22    Q.   Okay.  Does that sound about right that
23  you would have paid 14.95 per box?
24    A.   Yes.

94

1     Q.   Now, if we go to the line item below
2   that, it says "25.90"?
3     A.   Mm-hmm.
4     Q.   And "quantity 2," correct?
5     A.   Right, right.
6     Q.   Does that mean that you bought two boxes?
7     A.   Yes.
8     Q.   Okay.  And does that mean that it would
9   be about 12.95 a box?
10    A.   That's right.
11    Q.   Okay.  And if we go to the line item
12  below that, it says "33.90."  Do you see that?
13    A.   Yes.
14    Q.   Okay.  Do you see where it says "quantity
15  2.00"?
16    A.   Right.
17    Q.   Does that mean you bought two boxes?
18    A.   That's right.
19    Q.   Would that be about 16.95 per box?
20    A.   Yes.
21    MR. PONTIKES:  Approximately, right.
22  BY MS. CASTLE:
23    Q.   Okay.  Do you know anything about the
24  column that says "margin"?

95

1     A.   Margin on your right side?
2     Q.   Yes.
3     A.   Yes.
4     Q.   Do you know anything about that column,
5   the information in that column?
6     A.   No.
7     Q.   Is that Midwestern Cash and Carry --
8   that's not your margin, correct?
9     A.   No, no.
10    Q.   Okay.  Okay.  I believe the document
11  after that is a duplicate, so we can skip it.
12    MR. PONTIKES:  Mm-hmm.  No, actually it isn't.
13    MS. CASTLE:  Oh, no, actually, sorry.
14  You're -- you're right.  I'm sorry about that.
15  There is another one.
16       Oh, no, actually, I think -- no, you're right.
17  This is -- you're wrong.  It actually is kind of a
18  duplicate.  It's a different layout.
19    MR. PONTIKES:  It's the same information.
20    MS. CASTLE:  It's the same information, right.
21    MR. PONTIKES:  But it's a different document.
22    MS. CASTLE:  Right.
23  BY MS. CASTLE:
24    Q.   So do you know the difference between

96

1   these two documents, the one that we just talked
2   about, Item Sales Analysis Report, it says 10/17/11
3   at 1:14 p.m., and then the document after that is an
4   Item Sales Analysis Report at 10/17/11 at 1:11 p.m.?
5       Do you know what the difference between
6   these two documents are?
7     A.   No.
8     Q.   Do you know why we have these two
9   documents?
10    MR. PONTIKES:  If you know, you know.
11  BY THE WITNESS:
12    A.   You might look in the prices, you know,
13  same price what we buying from Dearborn.
14  BY MS. CASTLE:
15    Q.   Same price -- I'm sorry?
16    A.   Same thing we buy from Dearborn.
17  Dearborn is dollar extra, extra.
18    Q.   Oh, no, I know, but I'm asking you --
19    MR. PONTIKES:  She just wants to know why you
20  gave her two that looks like it's the same info.
21  That's all.  If you know, you know.  If you don't...
22  BY THE WITNESS:
23    A.   No.  I think it's, you know, similar to
24  that, you know, Dearborn, what we pay.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Bashir Chaudry                                         February 20, 2012

97

1    BY MS. CASTLE:
2        Q.   No, I know.  Sorry.
3             My question is:  These documents, if you
4    look at the last three -- if you look at the second
5    part of the document, the first page of the
6    document --
7        A.   Right.
8        Q.   -- from 1:14 p.m.?
9        A.   Mm-hmm.
10       Q.   And if you look at the first three, the
11   first part of the second document, with the
12   timestamp of 1:11 p.m.?
13       A.   Mm-hmm.
14       Q.   It appears to be the same information to
15   me.
16       MR. PONTIKES:  Right.
17   BY MS. CASTLE:
18       Q.   And I want to know from you why you gave
19   us these two documents with the same information in
20   a different format, slightly different format.
21       MR. PONTIKES:  Well, my -- it's just an
22   objection.  The only thing --
23   BY THE WITNESS:
24       A.   I think it's a different date --

98

1        MS. CASTLE:  Hold on.  Your Counsel is
2    objecting.
3        MR. PONTIKES:  Yeah.  And the other thing is,
4    apparently there's -- on the second page it's got
5    some other wrapping -- or a wrapping -- what do you
6    call it, rolling paper by another manufacturer.
7        MS. CASTLE:  Right, right.
8    BY MS. CASTLE:
9        Q.   So is that why you gave us these two
10   different documents, because there's on the one
11   dated time stamped 1:14 p.m., it has "TOP Menthol
12   Cigarette Pouch," and on the time stamped 1:11 p.m.,
13   it has "Golden Wrap Cigarette Paper"?
14       A.   I think so.
15       Q.   Okay.  But the information relating to
16   "TOP Cigarette Paper 24 Fine Gummed" is the same; is
17   that right?
18       A.   I think so.
19       Q.   Okay.  So if we look to, let's see, I
20   think it's the last two pages, so go to the second
21   to the last page, invoice number -- from Midwestern
22   Cash and Carry, LLC, invoice number 210729.  Do you
23   see that document?
24       A.   Yes.

99

1        Q.   Okay.  Do you recall if this is the
2    last -- if these two documents, one is dated 5/30/9
3    -- 09 and the one behind it is dated 12/14/09?
4        A.   Okay.
5        MR. PONTIKES:  Where are you finding the dates?
6        THE WITNESS:  In the middle.
7        MS. CASTLE:  Yeah.
8        THE WITNESS:  Here.
9        MR. PONTIKES:  Oh, okay.  Go ahead.
10   BY MS. CASTLE:
11       Q.   Are these the only invoices that you have
12   from Midwestern Cash and Carry, LLC?
13       A.   I think so.  That's what we found it.
14       Q.   Okay.  So the reason why you only
15   produced these two invoices is because you didn't
16   have any additional invoices from Midwestern Cash
17   and Carry, LLC?
18       A.   In the record that's what we found it, I
19   think.  We went through, you know, all the record,
20   whatever we found it.
21       Q.   Okay.
22       A.   It's not easy to go back three years.
23       Q.   So -- why -- I guess my question for you
24   is, you asked Midwestern Cash -- you asked Arif at

100

1    Midwestern Cash and Carry, LLC to run this report
2    for you, the Item Sales Analysis Report.  Why are
3    these invoices not on this report?
4        MR. PONTIKES:  Well, first of all, objection.
5    I don't think he means -- I think what we did was
6    asked him to find anything he had from Midwest.
7    'Cause if you'll notice, those invoices, the last
8    two, don't even have rolling papers on it.  So I
9    think what he did was just get anything that had
10   Midwest name on it as an invoice, but I'm not sure.
11   You can ask him.  I told him to be overly cautious
12   in whatever he had.
13       MS. CASTLE:  Well, let's --
14       MR. PONTIKES:  See what I mean?  I don't have
15   rolling papers on either one.
16       MS. CASTLE:  Let's see if this is -- okay.
17   Okay.
18   BY MS. CASTLE:
19       Q.   Okay.  So you don't have any invoices
20   from Midwestern Cash and Carry, LLC that --
21       A.   We went through whatever --
22       MR. PONTIKES:  Let her finish.  She wasn't
23   done.
24   BY MS. CASTLE:



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                          February 20, 2012

101

1      Q.  -- that match the invoice numbers listed
2   on Midwestern Cash and Carry, LLC's Item Sales
3   Analysis Report?  You don't have these invoices?
4      A.  No.
5      Q.  Okay.
6      MR. PONTIKES:  Somebody's going to bring that
7   disc down?
8      MS. CASTLE:  They did.  They did bring the disc
9   so we can get to that in a little bit.
10  BY MS. CASTLE:
11     Q.  Let's talk a little bit about my client's
12  product, TOP and TOP cigarette rolling papers and my
13  client's brand.
14         Are you familiar with TOP products?
15     A.  Yes.
16     MR. PONTIKES:  What do you mean?  All right, go
17  ahead, that's fine.
18  BY MS. CASTLE:
19     Q.  Are you familiar with TOP products?
20     A.  Yes.
21     Q.  Okay.  How do you know what a book -- how
22  do you know a booklet of cigarette rolling papers is
23  TOP?
24     A.  It says on top.

102

1      Q.  Are there any other -- does anything else
2   stand out to you as being TOP?
3      A.  No.  It says -- always say a name on it
4   in yellow color.
5      Q.  Okay.  Do you remember the first time you
6   saw TOP cigarette rolling papers?
7      A.  First time when I saw?  Might have been
8   18, 20 years in the business.  I don't remember.
9      Q.  So a long time ago.  Okay.
10     MR. PONTIKES:  Sharyn, can I get production of
11  that, too, so I have copies, 'cause nobody's ever
12  taken a photograph of which is the one that's
13  supposedly counterfeit and which isn't.
14     MS. CASTLE:  It's in the expert report.
15     MR. PONTIKES:  So they are identified?
16     MS. CASTLE:  Yes.
17     MR. PONTIKES:  But how are they identified?
18  Well, yours don't have markings.  That's fine.
19  We'll talk about it afterwards.
20     MS. CASTLE:  Okay.
21  BY MS. CASTLE:
22     Q.  I'm going to hand you a product.  It's
23  obviously TOP cigarette rolling papers.  This has
24  been previously marked as Plaintiffs' Exhibit 11.

103

1      Okay.  So I'm going to give this to you, and if you
2   could, just keep that in your left hand, okay?  And
3   I'm going to hand you --
4      MS. CASTLE:  Actually, I'm going to have the
5   court reporter mark -- I'm going to make a copy of
6   this at the end of the deposition.
7      MR. PONTIKES:  But you're going to have her
8   mark it right now?
9      MS. CASTLE:  No, she's not going to mark
10  anything on the product itself, but I'm going to
11  have --
12     MR. PONTIKES:  Okay, my only concern is that we
13  know -- that's fine.  As long as you know which is
14  which.
15     MS. CASTLE:  Yep.
16     MR. PONTIKES:  That's always been my concern on
17  this.
18     MS. CASTLE:  What we're going to do is at the
19  end of this deposition, I'll make a photocopy of it,
20  and she'll mark that.  And at the end of the
21  deposition, I'll also have the videographer capture
22  the whole booklet on video.
23     MR. PONTIKES:  That's fine.
24     MS. CASTLE:  Okay.

104

1   BY MS. CASTLE:
2      Q.  So -- but for right now, why don't you
3   keep this in your right hand.
4      MR. PONTIKES:  So which is it?  11 or 12?
5      MS. CASTLE:  No, that one is 11 and this is
6   going to be 35.  I believe we're on Exhibit -- 36.
7      MR. PONTIKES:  Okay, just so you know, the last
8   time when Marty -- or somebody did this, they marked
9   that one as different, but that's fine.
10     MS. CASTLE:  No, this is a different booklet.
11     MR. PONTIKES:  This is different from what he
12  had?
13     MS. CASTLE:  Yes.
14     MR. PONTIKES:  Then I would request at some
15  point that you produce everything that we've used so
16  far, 'cause I don't know --
17     MS. CASTLE:  Yeah.  Well, everything is in the
18  expert report.
19     MR. PONTIKES:  Well, that may be in the expert
20  report, but it's not here, so if I can get -- if we
21  can make video --
22     MS. CASTLE:  Well, you're going to get the
23  video.  You can get the video.
24     MR. PONTIKES:  Copies -- but not the video.  I



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                              February 20, 2012

105

1  want actual -- the photocopies that you're going to
2  do of everything so I know which is which 'cause --
3      MS. CASTLE: That's fine. We gave you copies
4  last time.
5      MR. PONTIKES: Well, actually, we didn't take
6  them, but we didn't have copies and they weren't
7  marked last time.
8      MS. CASTLE: Well, we did at Mubbasher Khan's
9  so also, because we made copies.
10     MR. PONTIKES: All right, Sharyn.
11     MS. CASTLE: So --
12     MR. PONTIKES: You've got 11 and then thirty
13 what.
14     MS. CASTLE: 36.
15     MR. PONTIKES: 36.
16         (WHEREUPON, a certain document was
17         marked Plaintiffs' Exhibit No. 36
18         for identification, as of this
19         date.)
20         (WHEREUPON, the document was
21         tendered to the witness.)
22 BY MS. CASTLE:
23     Q.  Let's just for clarity's sake, the one in
24 your left hand is Exhibit 11, okay? I'm just going

106

1  to refer to it as Exhibit 11.
2      A.  Okay, 11.
3      Q.  And the one in your right is Exhibit 36.
4      A.  36.
5      Q.  Okay. Now, if you could just take a look
6  at those products, keep them in your separate hands,
7  but take a look at the products, open them up, do
8  whatever you need to do.
9      MR. PONTIKES: Okay, just so you know, we're
10 not proffering him as an expert. He's here as a
11 layperson. So go ahead.
12     MS. CASTLE: Okay.
13 BY MS. CASTLE:
14     Q.  And I want you to let me know if you can
15 identify any differences in the product or if the
16 products are the same. I'd like you to be able to
17 tell me that, please.
18     A.  Both is TOP Paper.
19     Q.  Okay. You can go ahead and take as much
20 time as you need looking through them.
21     MR. PONTIKES: He just did.
22 BY THE WITNESS:
23     A.  Yeah, it's the same thing.
24 BY MS. CASTLE:

107

1      Q.  They're the same product?
2      A.  Yeah. That's all I do, take and give it,
3  take it and give it.
4      MR. PONTIKES: He's not rolling some.
5  BY THE WITNESS:
6      A.  [Unintelligible] this much.
7  BY MS. CASTLE:
8      Q.  You can -- you can put them down. If you
9  want to look at one over the other one, you can
10 just --
11     A.  I mean, I didn't pay attention. This is
12 the first time I look at it.
13     Q.  You work with these products a lot?
14     A.  To me it's the same thing, you know.
15     Q.  You work with these products a lot?
16     MR. PONTIKES: I'm going to object. He says he
17 sells them. He takes it -- his description was
18 before, and I want the record to be clear, I take
19 it, I put it, I put it there, and I sell it.
20 BY MS. CASTLE:
21     Q.  Do you sell these products?
22     A.  Yes.
23     Q.  Okay. And the first time you saw these
24 products, that was 18, 20 years ago?

108

1      A.  I've been, you know, dealing
2  approximately. I don't know same color was that or
3  different.
4      Q.  But same?
5      A.  Yeah, same kind of box, yellow constant.
6      Q.  And your testimony is that they're the
7  same?
8      A.  Yes.
9      Q.  Okay. You can't find any differences
10 between the two products?
11     MR. PONTIKES: Once again, same objection. He
12 said no, and he also said -- it is what it is. He's
13 not here proffered as an expert witness.
14     MS. CASTLE: I know.
15     MR. PONTIKES: Do you see any difference?
16     THE WITNESS: No.
17     MR. PONTIKES: Okay.
18 BY MS. CASTLE:
19     Q.  Okay. Okay. If you want, you can give
20 those back to me.
21     A.  36 and --
22     Q.  36, yes.
23         I'm on my own today, so --
24     MR. PONTIKES: So you're on a roll here.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

109

1  MS. CASTLE: -- I have to make sure that I'm
2  doing my own papers and documents here.
3  MR. PONTIKES: But my only concern is when you
4  put them back in there 'cause they're not marked --
5  MS. CASTLE: Okay. We'll do it again.
6  MR. PONTIKES: No, no, that's okay.
7  MS. CASTLE: No, no, no. We'll do it again.
8  MR. PONTIKES: My concern is if we're not just
9  using the same ones three times over.
10  MS. CASTLE: We are not. We will do it again.
11  BY MS. CASTLE:
12  Q.   So this is 11. This is in your left
13  hand. This is 36.
14  A.   Yeah, 36.
15  Q.   36.
16  MS. CASTLE: Here's what we will do. I'm going
17  to take -- if I had someone here, I'd have them go
18  out and make a copy right now.
19  MR. PONTIKES: Do you want to put a Post-It on
20  it so you can --
21  MS. CASTLE: I don't have a Post-It on me, but
22  I have a piece of paper. And at the end of the
23  deposition, we will --
24  MR. PONTIKES: Thanks. I really appreciate it.

110

1  Thank you.
2  MS. CASTLE: -- we will make copies.
3  We don't want any confusion either.
4  MR. PONTIKES: All right.
5  BY MS. CASTLE:
6  Q.   Do you advertise TOP products in your
7  store?
8  A.   No.
9  Q.   You never have any displays or promotions
10  associated with TOP products?
11  A.   No.
12  MR. PONTIKES: Well, only to the extent -- my
13  only objection would be he already said that they're
14  displayed behind the bulletproof glass.
15  MS. CASTLE: No, I understand. My question is
16  different.
17  BY MS. CASTLE:
18  Q.   My question is, do you have a display?
19  A.   No.
20  Q.   Sometimes people have posters or
21  cardboard cutouts.
22  A.   You mean like advertisements? No.
23  Q.   Advertisements?
24  A.   No.

111

1  Q.   Yeah. So there's no --
2  A.   No.
3  Q.   Okay.
4  A.   One or two customer comes in 24 hours.
5  MR. PONTIKES: One or two customers comes every
6  24 hours.
7  BY MS. CASTLE:
8  Q.   To buy TOP products?
9  A.   Yes.
10  Q.   Okay.
11  MR. PONTIKES: And parenthetically, he's not
12  buying the tobacco with it either.
13  MS. CASTLE: Well, we don't know that, but...
14  MR. PONTIKES: Probably not. He does.
15  MS. CASTLE: Okay.
16  BY MS. CASTLE:
17  Q.   When was your first knowledge that you --
18  when did you first learn of this lawsuit?
19  A.   When I saw, you know, this paper, you
20  know, that is somebody's looking for, you know,
21  there's some kind of, you know, you know, product or
22  somebody, you know.
23  Q.   I'm sorry, I didn't understand your
24  answer.

112

1  A.   When I saw this paper, that time I heard
2  it.
3  Q.   When you saw the Complaint?
4  A.   Right.
5  Q.   Okay. And that was the first time you
6  learned of the allegations that your gas station was
7  selling counterfeit TOP rolling papers?
8  A.   That's what I heard, you know.
9  MR. PONTIKES: That was the first -- she just
10  wants to know the first time.
11  BY THE WITNESS:
12  A.   Right, that's what I -- yeah.
13  BY MS. CASTLE:
14  Q.   That was the first time you knew?
15  A.   That's first time.
16  Q.   Okay. I take it from your invoices that
17  you have made purchases of TOP cigarette rolling
18  papers after you first learned of the allegations in
19  the Complaint?
20  A.   I just keep buying, you know.
21  Q.   You keep buying it?
22  A.   How I know, you know, which one is right,
23  no, because people asked to.
24  Q.   So you've continued to purchase?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                                February 20, 2012

113

1    A.   Continued to purchase.
2    Q.   Have you continued purchasing from
3 Midwestern Cash and Carry, LLC?
4    A.   From them, too, but usually we go
5 Dearborn, you know, buy frozen food, we buy it from
6 there. It's very close to us.
7    Q.   Okay. Do you have any way of -- you
8 purchase -- let me back up.
9        You purchase from Dearborn Wholesale and
10 I think you said Lawrence Discount and Midwestern
11 Cash and Carry, LLC. Do you have any way of keeping
12 track of which boxes come from which vendor?
13   A.   No.
14   Q.   Okay. So you just buy all the boxes from
15 the different vendors?
16   A.   Right.
17   Q.   And you don't know where you bought them
18 from?
19   A.   No.
20   Q.   Okay.
21   A.   Because they all look all same, you know.
22   MR. PONTIKES:  Right.
23 BY MS. CASTLE:
24   Q.   Have you ever received a cease and desist

114

1 letter asking you to stop selling counterfeit
2 products?
3    MR. PONTIKES:  Objection. Anything that he
4 would receive would be alleged counterfeit products,
5 but he can answer the question. I don't know of any
6 and I'm his attorney, but go ahead.
7        She's asking you, did you ever get a letter
8 that said stop selling certain products.
9    THE WITNESS:  Certain products?
10   MR. PONTIKES:  Yeah.
11 BY THE WITNESS:
12   A.   Not really.
13 BY MS. CASTLE:
14   Q.   Not just TOP cigarette rolling papers.
15 Any products?
16   A.   Not really.
17   Q.   Not really or no?
18   A.   No, sometimes City, you know, announce,
19 you know, recall, medicine or this, that, you know,
20 that, you know, warning. So this is warning, you
21 know, return it or put it on, take it off the shelf,
22 you know.
23   MR. PONTIKES:  He's saying the City.
24   MS. CASTLE:  I understand.

115

1 BY THE WITNESS:
2    A.   The City sent the letter.
3 BY MS. CASTLE:
4    Q.   But you never received a letter from a
5 company saying stop selling, you're selling
6 counterfeit products? Have you ever received a
7 letter like that?
8    A.   No, no.
9    Q.   Okay. Have you ever received any
10 third-party subpoenas?
11   A.   No.
12   MR. PONTIKES:  I don't know if he understands
13 that, but go ahead.
14 BY MS. CASTLE:
15   Q.   Have you ever received a subpoena?
16   A.   No, never heard, never receive anything
17 like this.
18   Q.   Okay. Do you know of any individual or
19 company that sells counterfeit TOP cigarette rolling
20 papers?
21   A.   No.
22   Q.   Okay.
23   MR. PONTIKES:  If he did, it would be on the
24 top of your list.

116

1    MS. CASTLE:  Well, I just want to make sure.
2 BY MS. CASTLE:
3    Q.   Does your gas station, Clark Gas and
4 Food --
5    MS. CASTLE:  Strike that.
6 BY MS. CASTLE:
7    Q.   Do you have any sort of policy to make
8 sure that you're not purchasing counterfeit
9 products?
10   MR. PONTIKES:  I'm going to object. That
11 assumes that he even knows what would be counterfeit
12 and what isn't. Go ahead.
13 BY THE WITNESS:
14   A.   There's -- I mean, if Dearborn starts
15 selling something on, you know, we don't know, we
16 just buy it, you know, bring it there. I mean, this
17 is 5-, 600, 700 items, maybe thousand items. We
18 can't, you know, figure out, you know, it's right or
19 wrong.
20   MR. PONTIKES:  All right.
21 BY THE WITNESS:
22   A.   We don't buy it on the street. I mean,
23 we go buy it --
24   MR. PONTIKES:  You got that, he doesn't buy it



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

117

1   on the street.
2   BY MS. CASTLE:
3       Q.   What did you do with your inventory of
4   TOP cigarette rolling papers when you were served
5   with the lawsuit?
6       A.   No.  We just have it like couple of
7   boxes, you know.
8       Q.   And what did you do with them?
9       A.   No.  We have it, you know, over there,
10  you know, we keep selling, keep buying, you know.
11      Q.   So once you were served with the lawsuit,
12  you kept selling the TOP cigarette rolling papers?
13      A.   Yeah, people are --
14      MR. PONTIKES:  Objection.  That assumes that he
15  knew or had reason to believe that something may
16  have been counterfeit, but my objection is as to the
17  record.  Go ahead.
18  BY MS. CASTLE:
19      Q.   No.  I'm just asking you if you kept
20  selling TOP cigarette rolling papers.
21      A.   We kept selling, you know, keep buying
22  from Dearborn, selling, you know.
23      Q.   Okay.  Did you go -- did you look for --
24  did you look at your inventory of TOP cigarette

118

1   rolling papers after you were served with the
2   Complaint?
3       A.   No.
4       Q.   So you just kept selling them?  You
5   didn't want to know what you were selling?
6       MR. PONTIKES:  Objection.  That's not his
7   testimony.  He said before he can't tell the
8   difference between what apparently you put down as a
9   counterfeit and a -- and when it's not counterfeit.
10  So now you're asking him if he knowingly kept on
11  selling counterfeit when he says he doesn't even
12  know how he could tell the difference.  But my
13  objection is as to the form and you're attempting to
14  mislead him.
15      Go ahead.  Listen to her question and
16  answer.
17  BY MS. CASTLE:
18      Q.   I'm asking you, when you were served with
19  the Complaint in the lawsuit, did you go and look at
20  your inventory of TOP cigarette rolling papers?
21      A.   No.
22      Q.   Okay.  So you never looked at them?
23      A.   No.  We have only two boxes, you know.
24  There's no big inventory we can look in.

119

1       Q.   Did you look at the booklets?
2       A.   We look at it.  It looks the same to me.
3       MR. PONTIKES:  All right.  So they looked --
4       MS. CASTLE:  I'm -- I'm -- I'm getting his
5   answers.  Steve, please.
6       MR. PONTIKES:  Well, I want to make sure I'm
7   getting it and the reporter is too.
8       Yeah.  Now I want to make sure it's actually
9   heard for the record before -- it's her deposition.
10      MS. CASTLE:  Let him finish his answer.
11      MR. PONTIKES:  All right.  Go ahead.
12      MS. CASTLE:  Now I -- I don't even remember my
13  question, so if you could go back.
14          (WHEREUPON, the record was read by
15           the reporter.)
16  BY THE WITNESS:
17      A.   No.
18  BY MS. CASTLE:
19      Q.   Okay.  Did anyone advise you --
20      MS. CASTLE:  Strike that.
21  BY MS. CASTLE:
22      Q.   Did anyone ask you to pull your booklets
23  from the shelf?
24      A.   No.

120

1       MS. CASTLE:  Okay.  Why don't we go off the
2   record and we can queue up the video and --
3       MR. PONTIKES:  Okay.  We're ready.
4       THE VIDEOGRAPHER:  Going off the video record
5   at 2:23 p.m.
6       MS. CASTLE:  Okay.
7          (WHEREUPON, a recess was had.)
8       THE VIDEOGRAPHER:  We're back on the video
9   record at 2:32 p.m.
10  BY MS. CASTLE:
11      Q.   Okay.  Mr. Chaudry, we've been trying to
12  get Exhibit 6, the DVD up and running throughout the
13  dep, and we finally have it up and running.  So if
14  you'll see, there's four video icons on the laptop.
15      Do you see that?
16      A.   Yeah, I can see.
17      Q.   Okay.  So if you double click on one of
18  them.  You can go to the first one.  I just want you
19  to watch the video.  Okay.  Let me know when it
20  comes on the screen.
21      A.   It's on the screen.
22      MR. PONTIKES:  Okay.  It's there.
23  BY MS. CASTLE:
24      Q.   Do you know what this video depicts?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

121
1      MR. PONTIKES: Do you know what this is? Is
2  that your store?
3  BY THE WITNESS:
4      A. I don't know really.
5      MR. PONTIKES: He doesn't -- you don't know
6  what? "I don't know really."
7  BY MS. CASTLE:
8      Q. Okay. Well, then, you can click on some
9  of the other ones. They're all --
10     MR. PONTIKES: How do we even click?
11     MS. CASTLE: You can get out of that video.
12     MR. PONTIKES: This one? Click this? What do
13  you want him to click?
14     MS. CASTLE: There should be like an "X" up at
15  the top. You can close out of that video.
16     MR. PONTIKES: Can you see it? I can't see it.
17  BY MS. CASTLE:
18     Q. And you can open another video. If you
19  can't tell if that's your store from the first
20  video.
21     MR. PONTIKES: Well, that's not your store
22  'cause people can't walk around like that, can they?
23     THE WITNESS: No, they can walk around there,
24  but I'm not sure.

122
1      MR. PONTIKES: Okay. Why don't you click
2  another one.
3      What does he need to click?
4      MS. CASTLE: Turn it around to me.
5  BY THE WITNESS:
6      A. Click here?
7  BY MS. CASTLE:
8      Q. No. Turn it around so I can see. Nope.
9  See the "X" in the upper right-hand corner? You can
10  click out of that and you can click on any of the
11  other video icons, and I want you to identify for me
12  if that's your store.
13     MR. PONTIKES: This is what -- okay. Go ahead.
14  BY THE WITNESS:
15     A. That's not my store.
16     MR. PONTIKES: Okay, that's not his store.
17  That's fine. Why don't you look at a couple other
18  ones just to be sure.
19     How does he click the other ones?
20     THE WITNESS: No, I -- I got it now.
21     MR. PONTIKES: You got it?
22     MS. CASTLE: He's a fast learner.
23     MR. PONTIKES: That's all the same store,
24  whosoever it is. Do you know --

123
1  BY MS. CASTLE:
2      Q. Is that your store?
3      A. No.
4      MR. PONTIKES: All right. Not his store. Why
5  don't you look at one more. Click that thing on
6  again.
7  BY THE WITNESS:
8      A. Because I don't have this kind of guy
9  work with me.
10  BY MS. CASTLE:
11     Q. I'm sorry. What was that?
12     A. Doesn't look like any kind of the guy
13  work with me.
14     MR. PONTIKES: Doesn't look like -- okay.
15     Once again, not yours?
16     THE WITNESS: No.
17     MR. PONTIKES: Okay. Not his. That's all for
18  the video.
19  BY MS. CASTLE:
20     Q. Okay. Once you're done watching the
21  video, you can close the laptop.
22     MR. PONTIKES: Are you done?
23  BY MS. CASTLE:
24     Q. Are you sure it's not your store?

124
1      A. That's what I'm trying to look.
2      No, I have a bigger counter.
3      MR. PONTIKES: He's got a bigger counter.
4  BY MS. CASTLE:
5      Q. So it's not your store?
6      A. No.
7      Q. Okay.
8      MR. PONTIKES: Let me close, 'cause I want to
9  get -- I want to move on. Okay.
10  BY MS. CASTLE:
11     Q. Okay. We are going to mark as Exhibit 37
12  your Responses to Plaintiffs' Request For
13  Production.
14     MS. CASTLE: The court reporter can mark this
15  as 37.
16         (WHEREUPON, a certain document was
17         marked Plaintiffs' Exhibit No. 37,
18         for identification, as of this
19         date.)
20         (WHEREUPON, the document was
21         tendered to the witness.)
22  BY MS. CASTLE:
23     Q. Have you ever seen this document before?
24     MR. PONTIKES: Yeah.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                  February 20, 2012

125

1   BY THE WITNESS:
2       A.   Yeah.
3   BY MS. CASTLE:
4       Q.   Yes, you have?  You've seen this document
5   before?
6       A.   Yes.
7       Q.   Okay.  Now, did anyone ask you to collect
8   any documents from your other gas station or
9   convenience store?
10      A.   No.
11      Q.   But your convenience store and gas
12  station, do you sell TOP cigarette rolling papers,
13  correct?
14      A.   Yes.
15      MR. PONTIKES:  I'm going to object for the
16  record as to the scope.  I mean, you've got
17  thousands of people that -- that sell TOP.  You've
18  identified this particular defendant as selling gas
19  and food.
20      MS. CASTLE:  This is actually South Chicago
21  One.
22      MR. PONTIKES:  I'm sorry, South Chicago One as
23  supposedly selling counterfeit when I don't believe
24  that happened, but we're not going to go and look at

126

1   every possible business to see what they sell and
2   what they don't sell.
3       MS. CASTLE:  Okay.  That's fine.
4       MR. PONTIKES:  That's my objection.  Go ahead.
5   BY MS. CASTLE:
6       Q.   My question -- and I can restate it is:
7   Did anyone ask you to collect documents from your
8   convenience store or your other gas station?
9       A.   No.
10      Q.   Okay.
11      MS. CASTLE:  We're going to mark as Exhibit 38
12  your Answers to Plaintiffs' Interrogatories.
13          (WHEREUPON, a certain document was
14          marked Plaintiffs' Exhibit No. 38,
15          for identification, as of this
16          date.)
17          (WHEREUPON, the document was
18          tendered to the witness.)
19  BY MS. CASTLE:
20      Q.   Have you seen Exhibit 38 before?
21      A.   Yes.
22      Q.   Now, if -- if you look at, for example,
23  Interrogatory Number 2, it says, "Identify all
24  products, goods, and merchandise that you have

127

1   produced, sold, offered for sale and/or distributed
2   for sale bearing any of the TOP Marks from
3   January 1, 2006 to the present."
4       Do you see that?
5       A.   Yes.
6       Q.   And your answer is:  "Defendant has no
7   information regarding these matters outside the
8   scope of being an owner and employee of Defendant
9   South Chicago One, Inc., the discovery answers
10  submitted on behalf of Defendant South Chicago One,
11  Inc. are thus the answer provided by this
12  defendant."
13      Do you see that answer?
14      A.   Yes.
15      MR. PONTIKES:  Mm-hmm.
16  BY MS. CASTLE:
17      Q.   And you provided that answer for many --
18  in response to many of your interrogatories, that
19  same answer?
20      A.   Right.
21      Q.   But did you -- you're deferring,
22  essentially, to Defendant South Chicago One, Inc.,
23  is that correct, in your answer here?
24      MR. PONTIKES:  What he's saying what he sold --

128

1   in answer to this question as an owner, is the only
2   thing he sold --
3       MS. CASTLE:  I -- I understand.  Let me just
4   ask my question.
5       MR. PONTIKES:  I don't think he understood your
6   question.
7   BY MS. CASTLE:
8       Q.   Are you -- do you understand my question?
9       A.   I'm trying.
10      Q.   Okay.  Do you need me to rephrase it?
11      A.   Please.
12      Q.   Okay.  Your answer here says -- look at
13  Defendant South Chicago One, Inc.'s answer; is that
14  correct?
15      A.   Right.
16      Q.   Okay.  But our question asks -- asks you
17  to identify any goods or products that you sold
18  bearing the TOP Marks.
19      A.   Mm-hmm.
20      Q.   Do you understand that?
21      A.   Yes.
22      Q.   Okay.  And you testified earlier that you
23  own a convenience store and another gas station --
24      A.   Right.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

129

1    Q.  -- that sells TOP cigarette rolling
2    papers, correct?
3    A.  Right.
4    MS. CASTLE:  Okay.  So, Steve, we would just
5    say --
6    MR. PONTIKES:  It is -- yeah, but -- okay, go
7    ahead and finish.
8    MS. CASTLE:  For the record, we would just say
9    that both Mr. Chaudry's responses to our
10   interrogatories and our doc requests are
11   insufficient and incomplete.  We don't have any
12   reference here to his convenience store or his other
13   gas station.
14   MR. PONTIKES:  My response is it's totally
15   irrelevant because he was produced here as a
16   defendant in the case and as an owner.  We're not
17   going to produce voluntarily any records that deal
18   with other entities that are not subject to this
19   lawsuit.
20   MS. CASTLE:  That's fine, but he's also been
21   sued as an individual, so he's been sued personally.
22   MR. PONTIKES:  Doesn't matter.  That's fine.
23   And we have a motion to dismiss him personally from
24   this for obvious reasons that he's a share -- that

130

1    he's an owner, and he should not be sued
2    individually, only the proper entity.  But it is
3    what it is.  So we've put what we need to put on the
4    record, both you and I.
5    MS. CASTLE:  Okay.  Well, I just want to point
6    out that motion hasn't been granted yet, and there
7    has been no stay of discovery, so as of right now we
8    would say that these discovery responses are
9    insufficient and incomplete.
10   MR. PONTIKES:  And we would say that you're not
11   getting anything more, other than what pertains to
12   this particular gas station.  If he owns ten
13   businesses and you want to know what he did with the
14   ten businesses, I don't believe that's within the
15   scope of discovery, but --
16   MS. CASTLE:  Well, those other businesses do
17   sell TOP cigarette rolling papers and, you know,
18   we'll have the Judge be -- well, he'll decide that,
19   but they do sell TOP cigarette rolling papers, so
20   that's how they're relevant.
21   MR. PONTIKES:  But he's already said that he
22   has no responsibility for buying or where they come
23   from, so he doesn't know where they -- who buys --
24   he doesn't know where they're purchased from.

131

1    Somebody else does all that, so I don't think he
2    would know anyway, but it is what it is.
3    MS. CASTLE:  Okay.  So we don't have those
4    records is what I'm saying and we asked for them.
5    MR. PONTIKES:  Right.  And we're not going to
6    produce them voluntarily.
7    MS. CASTLE:  Okay.
8    BY THE WITNESS:
9    A.  I'm not involved there, you know.  You
10   asked me do I have a share -- shareholder --
11   MR. PONTIKES:  You already testified.
12   MS. CASTLE:  Yes.
13   MR. PONTIKES:  All right.  You're done, 'cause
14   I only have one question.
15   MS. CASTLE:  No, I'm not done quite yet.
16   BY MS. CASTLE:
17   Q.  What did you do to prepare for your
18   deposition today?
19   MR. PONTIKES:  Don't get into what we talked
20   about, just what you looked at.
21   BY MS. CASTLE:
22   Q.  Yeah, I have no interest in your
23   conversation with Counsel.  I just --
24   MR. PONTIKES:  Well, you probably do, but you

132

1    can't get into it, but go ahead.
2    BY MS. CASTLE:
3    Q.  I -- I just want to know what you did to
4    prepare for today's deposition.
5    A.  Just what I answer.  You know, what I
6    produced, the paper.
7    Q.  Okay.  Did you meet with your attorney?
8    A.  Yes.
9    Q.  Okay.  Did you review documents?
10   A.  Yeah.  I look into it too.
11   MR. PONTIKES:  Okay, don't say what you did.
12   She just wants to know --
13   BY THE WITNESS:
14   A.  Yes.
15   MR. PONTIKES:  -- if you reviewed it.
16   BY MS. CASTLE:
17   Q.  Did you speak with anyone else regarding
18   your deposition here today?
19   A.  No.
20   Q.  Okay.  Did you speak with Nusrat
21   regarding your deposition today?
22   A.  Yeah.  He knows I'm coming.
23   Q.  He knows that you're being deposed today?
24   A.  Mm-hmm, right.

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                    February 20, 2012

133

1    Q.   But did you speak with him about that?
2    A.   No.  He knows my -- I have to go Monday
3  so, you know.
4    MR. PONTIKES:  Today is Monday, right?
5  BY MS. CASTLE:
6    Q.   Okay.  How does he know you have to --
7  how does he know you're being deposed today?
8    A.   Because I told him, you know, my attorney
9  called.  I have to come here Monday.
10    MR. PONTIKES:  Don't get into what we talked
11  about.
12    THE WITNESS:  Okay.
13  BY MS. CASTLE:
14    Q.   Okay.  How long was your meeting with
15  your attorney?
16    MR. PONTIKES:  Not getting into it.  You're not
17  getting into any of that.  Come on, Sharyn.  You
18  know better.  He's not going to do it on the advice
19  of Counsel.  It's none of your business.
20  Attorney-client privilege.  Anything about the
21  meeting, anything that was said --
22    MS. CASTLE:  That -- that's not privileged.
23  That's not privileged.
24    MR. PONTIKES:  You can bring it up with the

134

1  Judge.
2    MS. CASTLE:  That's not privileged.  That's
3  fine.
4  BY MS. CASTLE:
5    Q.   When did you meet with your attorney?
6    MR. PONTIKES:  Same objection.  Not going to
7  get into it.
8    MS. CASTLE:  When he met with you is not
9  privileged.
10    MR. PONTIKES:  It is.  We'll let the Judge --
11  answer that question for limited purpose.  When did
12  we meet?  To prepare for your dep, when did we meet?
13  Tell him today.
14  BY THE WITNESS:
15    A.   Today, yeah.
16  BY MS. CASTLE:
17    Q.   Okay.  So you met with your attorney
18  today to prepare for today's deposition?
19    A.   Right.
20    Q.   Okay.
21    MS. CASTLE:  Okay.  I -- I have no further
22  questions --
23    MR. PONTIKES:  I just have one --
24    MS. CASTLE:  -- but pending any -- I just want

135

1  to say that pending receipt of any additional
2  documents, any additional discovery, we're going to
3  reserve the right to call this witness back.
4    MR. PONTIKES:  Not a problem.  Okay.  One
5  question, one question only.
6    EXAMINATION
7  BY MR. PONTIKES:
8    Q.   When Counsel asked you after you got the
9  letter if you pulled -- if you pulled the rolling
10  papers off the shelf, and you said no, did you look
11  to see if you could tell the difference if one
12  was -- if one was counterfeit or one wasn't?
13    A.   I look into it, but there's no
14  difference, you know.
15    MR. PONTIKES:  All right.  That's all.  No
16  further questions.
17    All right, Sharyn, if I can just get a
18  copy of that before I go, I'd appreciate it.  Now,
19  the dep tomorrow is 9:30, right?  Okay.  9:30
20  tomorrow, then?
21    MS. CASTLE:  Yep.
22    THE VIDEOGRAPHER:  That will conclude today's
23  deposition of Bashir Chaudry on February 20, 2012.
24  We're going off the video record at 2:45 p.m.

136

1        FURTHER DEPONENT SAITH NOT.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                                February 20, 2012

137

1   STATE OF ILLINOIS )
2                     ) SS:
3   COUNTY OF C O O K )
4
5           I, ELIA E. CARRION, a Certified Shorthand
6   Reporter of said state, do hereby certify:
7
8           That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12
13          That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony given
17  and the proceedings had;
18
19          That the said deposition was taken before
20  me at the time and place specified;
21
22          That I am not a relative or employee of
23  attorney or counsel, nor a relative or employee of
24  such attorney or counsel for any of the parties

138

1   hereto, nor interested directly or indirectly in the
2   outcome of this action.
3
4           IN WITNESS WHEREOF, I do hereunto set my
5   hand of office at Chicago, Illinois, this 1st day of
6   March, 2012.
7
8   C.S.R. Certificate No. 084.004641.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

139

1                   I N D E X
2   BASHIR CHAUDRY              EXAMINATION
3     BY MS. CASTLE                5
4     BY MR. PONTIKES             135
5
6              E X H I B I T S
7                    PAGE/LINE NUMBER
8   Plaintiffs' Exhibit No. 32     14     21
9   Plaintiffs' Exhibit No. 33     15     3
10  Plaintiffs' Exhibit No. 34     68     9
11  Plaintiffs' Exhibit No. 35     69     18
12  Plaintiffs' Exhibit No. 36    105     17
13  Plaintiffs' Exhibit No. 37    124     17
14  Plaintiffs' Exhibit No. 38    126     14
15
16
17
18
19
20
21
22
23
24

140

1          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3   TOP TOBACCO, L.P. and        )
    REPUBLIC TOBACCO, L.P.       )
4                                )
        Plaintiffs,              )
5         vs.                    )   Case No.
    MIDWESTERN CASH AND CARRY,   )   1:11-cv-04460
6   LLC, MIDWEST CASH AND CARRY  )
    GROCERY, INC., f/k/a CASH    )
7   AND CARRY, INC., MIDWEST     )
    DISTRIBUTORS WAREHOUSE,      )
8   INC., NUSRAT H. CHOUDHRI,    )
    SABRA CHOUDHRI, BASHIR       )
9   CHAUDRY, MUBBASHER KHAN,     )
    ZUBAIR KHAWAJA, MUZAFAR ALI, )
10  YALE GAS AND FOOD, INC., et  )
    al.,                         )
11      Defendants.              )
12
13          I hereby certify that I have read the
14  foregoing transcript of my deposition given at the
15  time and place aforesaid, consisting of Pages 1 to
16  136, inclusive, and I do again subscribe and make
17  oath that the same is a true, correct and complete
18  transcript of my deposition so given as aforesaid,
19  and includes changes, if any, so made by me.
20          BASHIR CHAUDRY
21  SUBSCRIBED AND SWORN TO
22  before me this    day
23  of     , A.D. 201 .
24      Notary Public



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Bashir Chaudry                                              February 20, 2012

141

1               DEPOSITION ERRATA SHEET
2
3     Assignment No. 312823
4     Case Caption:  TOP TOBACCO, L.P. MIDWESTERN CASH AND
5     CARRY, LLC, et al.
6
7           DECLARATION UNDER PENALTY OF PERJURY
8        I declare under penalty of perjury that I have
9     read the entire transcript of my Deposition taken in
10    the captioned matter or the same has been read to
11    me, and the same is true and accurate, save and
12    except for changes and/or corrections, if any, as
13    indicated by me on the DEPOSITION ERRATA SHEET
14    hereof, with the understanding that I offer these
15    changes as if still under oath.
16          Signed on the _____ day of
17    _____, ___.
18    _____
19       BASHIR CHAUDRY
20
21
22
23
24

143

1               DEPOSITION ERRATA SHEET
2     Page No._____Line No._____Change to:_____
3     _____
4     Reason for change:_____
5     Page No._____Line No._____Change to:_____
6     _____
7     Reason for change:_____
8     Page No._____Line No._____Change to:_____
9     _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24       BASHIR CHAUDRY

142

1               DEPOSITION ERRATA SHEET
2     Page No._____Line No._____Change to:_____
3     _____
4     Reason for change:_____
5     Page No._____Line No._____Change to:_____
6     _____
7     Reason for change:_____
8     Page No._____Line No._____Change to:_____
9     _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24       BASHIR CHAUDRY



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com