# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TOP TOBACCO, L.P. and REPUBLIC TOBACCO, L.P., | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 11 C 4460 |
| v. | ) ) | |
| MIDWESTERN CASH AND CARRY, LLC; YALE GAS AND FOOD; SOUTH CHICAGO ONE, INC.; SOUTHERN GAS AND FOODS, INC.; NUSRAT CHOUDHRI; BASHIR CHAUDRY; ZUBAIR KHAWAJA; and MUZAFAR ALI, | ) ) ) ) ) ) ) ) ) | Magistrate Judge Maria Valdez |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This case alleging trademark infringement is before the Court on the parties'

cross-motions for summary judgment on Plaintiffs' Third Amended Complaint,

which alleges the following claims for relief: (1) Count I - Trafficking in Goods

Bearing Counterfeit Paper Marks, 15 U.S.C. § 1114(1); (2) Count II - Trafficking in

Goods Bearing Counterfeit Tobacco and Tobacco Products Marks, 15 U.S.C. §

1114(1); (3) Count III - False Designation of Origin and Trademark Infringement,

15 U.S.C. § 1125(a); (4) Count IV - Trademark Dilution, 15 U.S.C. § 1125(c); (5)

Count V - Violation of Illinois Uniform Deceptive Trade Practices Act, 815 Ill.

Comp. Stat. § 510 *et seq.*; (6) Count VI - Common Law Trademark Infringement; (7)

Illinois Anti-Dilution Act, 765 Ill. Comp. Stat. § 1036/65; and (8) Common Law

Unfair Competition.[1] The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiffs' Motion for Summary Judgment [Doc. No. 186] is granted in part and denied in part, and the Individual Defendants' Motion for Summary Judgment [Doc. No. 191] is denied.

## FACTS[2]

Plaintiff Top Tobacco, L.P. ("Top Tobacco") is a limited partnership organized under Delaware law that maintains its principal place of business in Illinois. (Pls.' LR 56.1(a)(3) ¶ 1.) Plaintiff Republic Tobacco, L.P. ("Republic") is also a Delaware limited partnership with its principal place of business in Illinois. (*Id.* ¶ 4.)

Defendant Midwestern Cash and Carry, LLC ("MCC") is an Illinois limited liability company with its principal place of business in Illinois. (*Id.* ¶ 7.) Midwestern operates as a wholesaler of general line groceries and tobacco products.

---

[1] Two foreign manufacturing defendants were added as parties in Plaintiff's First Amended Complaint, filed on July 21, 2011. Default judgment was entered against both of those defendants on February 26, 2013.

[2] Unless otherwise noted, the following material facts are either undisputed or deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Malec v. Sanford*, 191 F.R.D. 581, 583-84 (N.D. Ill. 2000). The events are recounted in the light most favorable to the nonmovant, with relevant disputes noted. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 299–300 (7th Cir. 2011); *see also Scherer v. Rockwell Int'l Corp.*, 766 F. Supp. 593, 595 n.1 (N.D. Ill.1991) ("Where as here cross-motions for summary judgment are involved . . . this Court is in the Janus-like position of having to draw all reasonable inferences in favor of each nonmovant . . . .").

(*Id.* ¶ 8.) Defendant Nusrat Choudhri is the Managing Member, Principal, and President of Midwestern. (*Id.* ¶ 9.)

Defendant Choudhri also owns the land on which several gas station/mini-marts are located, including defendants Yale Gas and Food, Inc. ("Yale"); Southern Gas and Food, Inc. ("Southern"); and South Chicago One, Inc. d/b/a Clark Gas and Food ("Clark"). (*Id.* ¶ 10.) Defendant Bashir Chaudry is the President of Clark, an Illinois corporation operating as a Clark gas station, and he manages its day-to-day business activities. (*Id.* ¶¶ 11-13.) Defendant Zubair Khawaja owns Southern, an Illinois corporation operating as a Mobil gas station, and he manages its business activities, including the purchase and sale of tobacco-related products. (*Id.* ¶¶ 14-16.) Defendant Muzafar Ali owns Yale, an Illinois corporation operating as a BP gas station, and he manages its business activities.[3] (*Id.* ¶¶ 17-18.)

This Court has personal jurisdiction over all of the defendants because they have engaged in business activities in, and directed to, the State of Illinois and within this judicial district. (*Id.* ¶ 19.) The court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1338 and 1367, and venue is proper in this district pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiffs reside, Plaintiffs and Defendants transact business in this district, and Defendants are subject to personal jurisdiction in this district. (*Id.* ¶¶ 20-21.)

---

[3] MCC, Yale, Southern, and Clark will be collectively referred to as the "Corporate Defendants," and Choudhri, Chaudry, Khawaja, and Ali as the "Individual Defendants."

Plaintiffs are engaged in the distribution and sale of smokers' articles, including tobacco and related products such as cigarette rolling papers, and they are the largest distributors of roll-your-own tobacco cigarettes, rolling paper booklets, filter tubes, filters, and accessories in the United States. (*Id.* ¶ 22.) Top Tobacco owns and maintains various federal word and design trademark registrations for use in connection with cigarette rolling papers, tobacco, and smokers' articles, including Registration Nos. 2,739,465 and 2,831,105 (the "TOP Marks"). (*Id.* ¶¶ 27-28.) The TOP trademark is the oldest rolling tobacco trademark in the United States, having been first used in the early 1900s. (*Id.* ¶¶ 2-3, 25.) TOP is the second leading selling brand of cigarette paper booklets in the United States. (*Id.* ¶ 23.)

Republic is the sole authorized master distributor for all TOP brand products in the United States. Top Tobacco contracts with Republic to market and sell TOP branded cigarette rolling paper booklets and smoking tobacco products nationwide to wholesalers, distributors, and retailers, such as convenience stores, food and drug stores, gas stations mini-marts, mass merchandisers, cash-and-carry businesses, and tobacco outlet chains. (*Id.* ¶¶ 4-5, 30-31; Defs.' LR 56.1(a)(3) ¶ 35.)

Republic Technologies France is the sole manufacturer of TOP-brand cigarette rolling papers. TOP-brand cigarette rolling papers are manufactured to certain specifications and undergo testing and other quality measures in order to maintain the product's consistency and to ensure customer satisfaction. (Pls.' LR 56.1(a)(3) ¶ 29.) A case of legitimate TOP-brand rolling papers contains forty boxes

of TOP cigarette rolling paper and is labeled as TOP paper. Each case also contains a UPC, a product description, and a shipping label, and each case is marked Republic Tobacco. (*Id.* ¶ 48.)

On or about June 18, 2010, Chad Goldenberg, a Republic territory sales executive, visited MCC's warehouse for the purpose of counting MCC's inventory of TOP cigarette rolling papers. He observed sixteen purported cases of TOP papers containing only twenty-eight boxes each and noted that the cases were unmarked and did not resemble the packaging of legitimate TOP product. (*Id.* ¶ 47.) On October 15, 2010, Republic investigators purchased what purported to be TOP-brand rolling papers from four gas stations in the Chicago area, including defendants Yale, Southern, and Clark. (*Id.* ¶¶ 49, 51.) MCC was one of the suppliers of rolling papers to the four gas stations. (*Id.* ¶ 50.) The product purchased appeared to be identical to authentic TOP product. (*Id.* ¶ 53.)

In January 2011, samples of the product purchased in October 2010 were sent to Republic Technologies in France for testing. Republic Technologies found that the subject papers differed from authentic TOP product with regard to the composition, the glue used, the color of the blue leaves, and the box and cover, leading to a determination that all of the samples purchased were counterfeit. (*Id.* ¶¶ 52-54.)

Papers from the same four gas stations were purchased again on March 19, 2011 and were sent to Republic Technologies for testing. These samples also

appeared to be authentic, but Republic Technologies concluded that three of the four samples were counterfeit. The fourth sample, which was purchased from Clark, was determined to be authentic. (*Id.* ¶¶ 55-58.) Republic Technologies concluded that the three counterfeit samples were nearly identical to the counterfeit product previously tested in January 2011. (*Id.* ¶ 59.)

On April 8 and 9, 2011, investigators purchased two cases of purported TOP-brand rolling papers directly from MCC. The investigators found that MCC was selling sealed cartons of authentic TOP-brand rolling papers as well as smaller, unmarked cartons containing boxes of what were purported to be authentic TOP-brand papers. (*Id.* ¶¶ 60-61.) The clerk working at the time explained that MCC sells "boxes of thirty" (the unmarked cartons) and "boxes of forty" (the sealed authentic product marked with Republic logos). (*Id.* ¶¶ 62-64.) The "boxes of thirty" actually only contained twenty-eight boxes of papers, so the clerk had to remove the tape from the box and add two more boxes to total thirty. (*Id.* ¶ 63.) Republic does not sell TOP-brand rolling paper in "boxes of thirty." (*Id.* ¶ 65.) The investigators purchased a "box of thirty," and samples were sent to Republic Technologies for testing on May 11, 2011. (*Id.* ¶ 66.) The appearance of the papers was identical to the authentic product, but Republic Technologies determined again that all of the samples were counterfeit, and the technical characteristics of the product were nearly identical to the counterfeit product analyzed earlier. (*Id.* ¶ 67.) Additional

samples produced during defendant Choudhri's deposition on March 23, 2012 were also tested and determined to be counterfeit. (*Id.* ¶ 68.)

All of the papers purchased from MCC and the gas stations include labels, graphics, and logos that are confusingly similar to, and/or are colorable imitations of, authentic TOP-brand products and the TOP Marks. (*Id.* ¶ 69.) None of the Individual Defendants was able to differentiate authentic TOP rolling papers from the counterfeit rolling papers sold at their establishments. (*Id.* ¶ 70; Defs.' LR 56.1(a)(3) ¶ 30.) Plaintiffs' investigator and salesman were also unable to differentiate between authentic and counterfeit booklets. (Defs.' LR 56.1(a)(3) ¶¶ 30, 36.)

Three MCC employees have primary responsibility over the purchase and sale of tobacco-related products. (*Id.* ¶ 2.) Defendant Choudhri generally did not purchase or sell cigarette rolling papers himself. (*Id.* ¶ 3.) MCC has bought TOP-brand rolling papers from several distributors since 2008. (*Id.* ¶ 4.) From approximately February 16, 2009 until May 18, 2010, MCC regularly purchased authentic TOP-brand cigarette papers from Republic. MCC did not purchase additional papers from Republic until on or about May 3, 2011. (Pls.' LR 56.1(a)(3) ¶ 34.) In 2010, MCC engaged in a "barter transaction" with a company called Country Bright Imports in which it acquired 280 boxes of what purported to be TOP-brand cigarette rolling papers in exchange for bags, and no contemporaneous invoice was

created. (*Id.* ¶¶ 35-36.) MCC continued to sell TOP-brand product after the lawsuit was filed in June 2011. (*Id.* ¶ 37.)

Yale offers TOP-brand cigarette rolling papers for sale to the general public. Yale does not keep records of individual sales but does keep some purchase invoices. (*Id.* ¶ 38; Defs.' LR 56.1(b)(3)(B) ¶ 38; Defs.' LR 56.1(a)(3) ¶ 19.) A Yale employee, Faheem Hasan, is in charge of bookkeeping and buying inventory for Yale, although Ali has also done some purchasing. (Defs.' LR 56.1(a)(3) ¶¶ 17, 19; Pls.' LR 56.1(b)(3)(B) ¶ 17.) Hasan has purchased TOP tobacco products from several different vendors, including an individual named Oumar, who would bring product to the gas station in a van. (Pls.' LR 56.1(a)(3) ¶ 39; Defs.' LR 56.1(b)(3)(B) ¶ 39; Defs.' LR 56.1(a)(3) ¶ 18.)

Southern offers TOP-brand cigarette rolling papers for sale to the general public. Southern keeps invoices of its purchases of TOP-brand products but does not account for individual sales. (Pls.' LR 56.1(a)(3) ¶ 41; Defs.' LR 56.1(b)(3)(B) ¶ 41.) Defendant Khawaja, Southern's owner, purchases inventory on behalf of Southern from several different vendors in the Chicago area. (Defs.' LR 56.1(a)(3) ¶¶ 24-25.) Khawaja has occasionally bought purported TOP rolling papers from a person named Umer, who sold inventory out of a van. (Pls.' LR 56.1(a)(3) ¶ 42; Defs.' LR 56.1(a)(3) ¶ 25.) After receiving notice of the complaint, Khawaja inspected the box or boxes of TOP-brand rolling papers he had in inventory and continued to sell the product. (Pls.' LR 56.1(a)(3) ¶ 43; Defs.' LR 56.1(b)(3)(B) ¶ 43.)

Clark offers TOP-brand cigarette rolling papers for sale to the general public. Clark does not have a computer to record the sales of TOP tobacco products or other inventory, but it maintains vendor invoices. (Pls.' LR 56.1(a)(3) ¶ 44; Defs.' LR 56.1(b)(3)(B) ¶ 44; Defs.' LR 56.1(a)(3) ¶ 15.) Defendant Chaudry, Clark's president, purchases inventory on behalf of Clark, but he does not typically work behind the counter or sell any products, including TOP-brand rolling papers. (Defs.' LR 56.1(a)(3) ¶¶ 10-11.) After receiving notice of the complaint, Chaudry looked at the two boxes of TOP-brand rolling papers he had in inventory and continued to sell that product and to purchase additional TOP-brand rolling papers from MCC, although they most often bought product from Dearborn Wholesale. (Pls.' LR 56.1(a)(3) ¶¶ 45-46; Defs.' LR 56.1(b)(3)(B) ¶¶ 4546)

During his February 16, 2012 deposition, defendant Choudhri admitted that after receiving notice of the complaint, he disposed of all rolling papers bearing the TOP brand, regardless of when they were purchased or from whom they were purchased, except for one box of twenty-four booklets, which he gave to his attorney. (Pls.' LR 56.1(a)(3) ¶¶ 76-77.) The spoliation was the subject of a motion for sanctions, which this Court recommended be granted in part. The District Court then presiding adopted this Court's recommendation to: (1) instruct the jury that it may draw a negative or adverse inference based on the destroyed evidence; (2) bar Defendants from attempting to prove that the destroyed evidence was not in fact counterfeit TOP-brand product; and (3) order Defendants to pay Plaintiff fees and costs incurred in connection with that motion. (*Id.* ¶¶ 78-80.)

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite,

competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted).

"In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)).

In addition, "[c]onclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002). Similarly, affidavits or depositions based on speculation, rumor, or conjecture are not sufficient to defeat a properly supported motion for summary judgment. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 337 (7th Cir. 1991). Finally, the Court is "'not required to draw every conceivable inference from the record,'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II.     COUNTS I-III: CORPORATE DEFENDANTS

Defendants do not contest Plaintiffs' motion for summary judgment as to the infringement claims in Counts I-III against the Corporate Defendants. The Court agrees that the undisputed material facts establish that Plaintiffs own protectable trademarks and that the Corporate Defendants "use[d] in commerce any

reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1). Moreover, the undisputed evidence in the record demonstrates that the corporate defendants "use[d] in commerce any word, term, name, symbol, or device, . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . ." 15 U.S.C. § 1125(a)(1)(A); *see Lorillard Tobacco Co. v. Div. & Noble Amoco Corp.*, No. 03 C 5127, 390 F. Supp. 2d 678, (N.D. Ill. 2005) (citing *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F2d 1143, 1152 n.6 (7th Cir. 1992)) ("Because sellers bear strict liability for violations of the Lanham Act, even innocent dealers who sell goods bearing an infringing mark are liable for trademark infringement."). Plaintiffs' motion for summary judgment is therefore granted against the Corporate Defendants on Counts I-III.

## III.    WILLFULNESS

The issue of willfulness is relevant to three separate issues in the case: (1) liability of the Individual Defendants; (2) statutory damages against the Corporate Defendants; and (3) attorneys' fees, which may be awarded "in exceptional cases," often defined as ones "in which the acts of infringement can be characterized as

'malicious, fraudulent, deliberate, or willful.'" *NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 547 (7th Cir. 1988) (citation omitted).

As previously discussed in the District Court's order granting in part Defendant's motion to dismiss the Second Amended Complaint, the Individual Defendants cannot be held liable for infringement unless "they 'personally participate[d] in the manufacture or sale of the infringing article' or 'use[d] the corporation as an instrument to carry out [their] own willful and deliberate infringements' or 'to avoid personal liability.'" *Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC*, No. 11 C 4460, slip op. at 2 (N.D. Ill. June 6, 2012) (citing *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926); *see also Asher Worldwide Enters. LLC v. Housewaresonly.com*, No. 12 C 568, 2013 WL 4516415, at *3 (N.D. Ill. Aug. 26, 2013) ("[F]or personal liability for corporate intellectual property infringement to extend to corporate officers, a special showing must be made that they acted willfully and knowingly and personally participated in the infringing activities or used the corporation to carry out their own deliberate infringement."); *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL 22038593, at *13 (N.D. Ill. Aug. 28, 2003) ("Personal liability for trademark infringement and unfair competition is established if a corporate officer is a moving, active, conscious force behind the defendant corporation's infringement.") (citation and internal quotation omitted).

Plaintiffs' motion includes a prayer for the maximum amount of statutory damages against all defendants.[4] A plaintiff that elects to recover statutory damages, rather than actual damages and profits, can be awarded an amount "not less than $1,000 or more than $200,000," but "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c).

Plaintiffs argue that the Individual Defendants willfully infringed their trademarks because they are responsible for the purchase and sale of tobacco-related products; admittedly purchased purportedly TOP-branded rolling papers from an unknown person selling them out of a van; failed to record purchase sales and transactions; did not inspect their inventory and/or continued to sell TOP-branded papers after being served with the complaint; and further that Choudhri's willfulness can be inferred from his spoliation of evidence.

The Individual Defendants dispute these allegations, claiming that they did not personally participate in the purchase or sale of TOP-brand rolling papers for their stores, did not authorize the purchase of the counterfeit product at issue, and had no reason to be suspicious of product purchased from mobile vendors; there is

_____

[4] In their reply, Plaintiffs acknowledge that it would be up to a jury to determine the actual dollar amount of statutory damages if more than the statutory minimum is awarded. *See BMG Music v. Gonzalez*, 430 F.3d 888, (7th Cir. 2005). Therefore, Plaintiffs state that if summary judgment is granted against all Defendants on liability, and the Court finds willfulness and awards the minimum statutory damages against all Defendants other than MCC, they will agree to proceed to trial solely to determine the amount of damages to be awarded against MCC.

no evidence that they failed to record purchase and sales transactions in order to conceal their dealing in counterfeit goods; and to the extent the stores continued to sell TOP product after being served with the complaint, the Individual Defendants did first examine their inventory; and Choudhri's destruction of boxes of papers does not demonstrate that he knowingly sold counterfeit product.

Willful infringement is found "if the infringer knows that its conduct is an infringement or if the infringer has acted in reckless disregard" of the rights of the intellectual property owner. *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1020 (7th Cir. 1991), *rev'd on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) (discussing copyright infringement); *see Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 511 (7th Cir. 1994). Thus, in order to demonstrate willfulness, Plaintiffs "must make a showing regarding [Defendants'] state of mind." *V3 Solutions*, 2003 WL 22038593, at *14 (denying summary judgment for an individual's secondary liability for a corporation's trademark infringement); *see Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007), *rev'd in part on other grounds by McCarter v. Retirement Plan for Dist. Managers of Am. Family Ins. Group*, 540 F.3d 649 (7th Cir. 2008) ("[I]n determining whether a defendant acted with willful blindness to counterfeit products, as a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.") (citation and internal quotation omitted); *Video Views*, 925 F.2d at 1020 ("The determination of willfulness, which requires

the assessment of the defendant's intent, is an issue of fact."); *Int'l Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 380 (7th Cir. 1988) (noting that willfulness under the Copyright Act is a question of fact); *see also Hard Rock Licensing*, 955 F.2d at 1149 ("To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate. . . . [A defendant] has no affirmative duty to take precautions against the sale of counterfeits. Although the 'reason to know' part of the standard for contributory liability requires [a defendant] (or its agents) to understand what a reasonably prudent person would understand, it does not impose any duty to seek out and prevent violations.").

Plaintiffs' argument that the Individual Defendants "were *personally* involved in the infringing activity," presumes too much at this stage. (Pls.' Mot. at 8) (emphasis in original). All of the evidence cited by Plaintiffs in support of this contention is disputed by competent evidence supplied by Defendants and thus a finding of willfulness would require inferences to be made in Plaintiffs' favor. In fact, Plaintiffs' own submissions urge that "one could reasonably infer" the Individual Defendants directed the activities of the corporations, that defendant Choudhri "must have known" he purchased counterfeit goods from Country Bright, and that "there is every indication that Defendant Choudhri knew he and his company were buying and selling TOP cigarette rolling papers that were not legitimate." (Pls.' Reply at 2-3; Pls.' LR 56.1(b)(3)(B) ¶ 4.) Plaintiffs are correct that one could reasonably infer knowledge and willfulness from the evidence in the record, but any such inferences are not so necessary to take the issue out of a jury's

hands. The fact that the Individual Defendants knowingly sold product that turned out to be infringing does not establish that they knew the product was infringing at the time they sold it. The Court's previous order that a jury may draw an adverse inference that the destroyed product was counterfeit is not dispositive of Choudhri's knowledge at the time the papers were purchased or sold.

Most of the decisions Plaintiffs rely on as examples of cases finding willfulness and/or awarding maximum statutory damages are unpersuasive for the purposes of making such a finding at the summary judgment stage. *See, e.g.*, *Coach, Inc. v. Diva's House of Style*, No. 3:11-CV-253 JD, 2012 WL 6049722 (N.D. Ind. Dec. 5, 2012) (granting summary judgment against *pro se* defendants who filed no opposing brief); *Coach, Inc. v. Does 1-573*, 12 C 1514, slip op. (N.D. Ill. Oct. 15, 2012) (awarding damages against defaulting defendants); *Coach, Inc. v. Allen*, No. 11 Civ. 2590, 2012 WL 2952890 (S.D.N.Y. July 19, 2012) (granting summary judgment against *pro se* defendant who filed no opposing brief); *Deckers Outdoor Corp. v. Does 1-100*, No. 12 C 377, slip op. (N.D. Ill. Apr. 11, 2012) (defaulting defendants); *Deckers Outdoor Corp. v. Liyanghua*, No. 11 C 7970, slip op. (N.D. Ill. Apr. 11, 2012) (defaulting defendants); *Deckers Outdoor Corp. v. Does 1-55*, No. 11 C 10, 2011 WL 4929036 (N.D. Ill. Oct. 14, 2011) (defaulting defendants); *Gen. Council of the Assemblies of God v. Ranger Supply Store, Inc.*, No. 10 C 7050, slip. op. (N.D. Ill. June 29, 2011) (defaulting defendants); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) (finding willfulness after a bench trial); *Burberry Ltd. v. Designers*

*Imports, Inc.*, No. 07 Civ. 3997(PAC), 2010 WL 199906 (S.D.N.Y. Jan. 19, 2010) (finding willfulness after a bench trial); *Microsoft Corp. v. Rechanik*, 249 Fed. Appx. 476 (7th Cir. Oct. 2, 2007) (unpublished decision) (granting summary judgment against *pro se* defendant who submitted no contradictory evidence); *Lorillard Tobacco Co. v. S & M Cent. Serv. Corp.*, No. 03 C 4986, 2004 WL 2534378 (N.D. Ill. Nov. 8, 2004) (finding willfulness after a jury trial); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F. Supp. 2d 511 (S.D.N.Y. 2004) (finding willfulness after a bench trial).

The cases in which a court did find willfulness after a contested summary judgment motion are distinguishable. In *A & E Oil*, the evidence showed that the tax stamps on counterfeit cigarettes "were noticeably fraudulent"; the store's owner testified that he always inspects the tax stamps and did not notice any discrepancies; the defendants' explanations as to the possible source of the counterfeit product was inconsistent; and the defendants' "conduct during discovery suggests that it knew about the counterfeit cigarettes." *A & E Oil*, 503 F.3d at 593-94. Here, Plaintiffs argue that the cases of counterfeit TOP papers obviously looked different in appearance from those containing legitimate product, but a different, even unmarked, appearance, is not equivalent to "noticeably fraudulent" tax stamps that were undisputedly inspected as in *A & E*. Plaintiffs also point out that in *A & E*, the defendants had purchased their counterfeit cigarettes from a man named Umar. *See Lorillard Tobacco Co. v. A & E Oil, Inc.*, No. 03 C 5833, 2006 WL

1430774, at *5 (N.D. Ill. May 16, 2006), *aff'd*, 503 F. 3d 588 (7th Cir. 2007). But the fact that the *A & E* defendants may have purchased their counterfeit product from the same source as Defendants in this case does not establish willfulness. Plaintiffs do not allege that Defendants were aware of the district court's opinion in *A & E*, nor have they raised any other evidence showing that Umar sold counterfeit goods other than that requiring an inference in their favor.

Other cited cases are similarly unpersuasive. *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585 (S.D.N.Y. 2010) (finding corporate willfulness on summary judgment when the defendant was on notice of infringement after the entry of an injunction years earlier, a cease and desist letter was sent, and the defendant failed to comply with its own anti-infringement internal procedures); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328-29 (S.D.N.Y. 2003) (finding willful copyright infringement as a matter of collateral estoppel based on prior litigated cases as well as defendant's unreasonable reliance on an erroneous legal defense); *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995) (holding that copyright infringement was willful when defendants continued to make and distribute records after receiving notice that their copyright licenses were terminated); *Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1332-33 (D.N.J. 1994) (finding intentional infringement when defendants sold counterfeit software after receiving notice that products purchased from their supplier "should be considered suspect as

19

counterfeit"). Plaintiffs' statement of facts repeatedly contends that Defendants continued to sell TOP-brand papers after receiving notice of the complaint in this case, but notably absent is any allegation, let alone undisputed fact, that *counterfeit* papers were sold after Defendants received notice of possible infringement.

The same genuine issues of material fact relating to the issue of willfulness also exist with respect to the lack of willfulness argued in support of the Individual Defendants' motion. A reasonable jury could find in favor of either party, and therefore summary adjudication is not appropriate.

## IV.    COUNTS IV AND VII - DILUTION

Count IV alleges trademark dilution under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c), and Count VII alleges a counterpart claim under the similar Illinois Trademark Registration and Protection Act ("TRPA"), 765 Ill. Comp. Stat. § 1036/65(a). Pursuant to the FTDA:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

Trademark dilution can take two forms – blurring and tarnishing. Plaintiffs allege both forms occurred here. Blurring "occurs when consumers see the plaintiff's mark used on a plethora of different goods and services, raising the possibility that

the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) (citation and internal quotations omitted). Tarnishing, however, "occurs when a junior mark's similarity to a famous mark causes consumers mistakenly to associate the famous mark with the defendant's inferior or offensive product." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000).

To prove dilution under the Lanham Act, Plaintiffs must show that: (1) the TOP mark is famous; (2) Defendants adopted the mark after the TOP mark became famous; (3) the alleged infringement is likely to cause dilution; and (4) Defendants' use of the TOP mark is commercial and in commerce.[5] *See Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999); *Desmond v. Chi. Boxed Beef Distribs., Inc.*, 921 F. Supp. 2d 872, 883 (N.D. Ill. 2013).

Defendants argue that summary judgment is not appropriate because Plaintiffs' mark is not famous. Under the Lanham Act:

> [A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> > (i)    The duration, extent, and geographic reach of advertising and publicity of the mark, whether

---

[5] Prior to being amended in 2006, the Lanham Act required a plaintiff to prove that another person's commercial use of the mark "causes dilution of the distinctive quality of the mark." *See* 15 U.S.C. § 1125(c)(1). The Illinois TRPA continues to require that the use of the mark "causes dilution." 765 Ill. Comp. Stat. § 1036/65(a).

                    advertised or publicized by the owner or third
                    parties.

     (ii)     The amount, volume, and geographic extent of
                    sales of goods or services offered under the mark.

     (iii)    The extent of actual recognition of the mark.

     (iv)    Whether the mark was registered under the Act of
                    March 3, 1881, or the Act of February 20, 1905, or
                    on the principal register.

15 U.S.C.A. § 1125(c)(2)(A).

In a previous case, another court in this district agreed with Defendants'

argument. After first noting that "Top Tobacco's dilution claim starts and ends with

the threshold requirement that the TOP mark be famous," the district court

concluded that "the TOP mark is not famous." *Top Tobacco, L.P. v. N. Atl.*

*Operating Co., Inc.*, No. 06 C 950, 2007 WL 118527, at *8 (N.D. Ill. Jan. 4, 2007),

*aff'd*, 509 F.3d 380 (7th Cir. 2007) (discussing relevant factors such as "the relative

weakness of the TOP mark, the vast number of similar third-party marks in the

tobacco market, and Top Tobacco's admission that marks using the word 'top' are

weak").

Plaintiffs argue that Defendants' reliance on *North Atlantic* is misplaced

because in this case, Plaintiffs are seeking to protect their design marks, and *North

Atlantic* held only that the word "TOP" was not famously distinctive. According to

Plaintiffs, the Seventh Circuit "impliedly held Plaintiffs' design marks *should* enjoy

such protection." (Pls.' Reply at 15) (emphasis in original). Plaintiffs cite the

following background language in the appellate opinion affirming *North Atlantic*:

"Top Tobacco and its predecessors have been in this [loose tobacco] segment of the cigarette market for more than 100 years, and the mark TOP, printed above a drawing of a spinning top, is well known among merchants and customers of cigarette tobacco." *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 509 F.3d 380, 381 (7th Cir. 2007). That opinion also addresses the dissimilar trade dress of the two products at issue in the context of whether a customer could confuse them. *Id.* at 382-83. But background *dicta* describing the history of the TOP brand is not sufficient to establish that there is no genuine issue of material fact as to whether the TOP mark is famous. Similarly, Plaintiffs' statement of facts establishing that the brand is widely sold and is one of the oldest tobacco brands in the country, (*see* Pls.' LR 56.1(a)(3) ¶¶ 22-26), is not sufficient to demonstrate the mark is famous for purposes of the dilution statute. *See Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 523 (N.D. Ill. 2011) (finding company president's affidavit and deposition testimony, coupled with a discussion of advertising expenditures and activities, to be insufficient to prove that a mark is "famous" for purposes of trademark dilution). The fact that the TOP trade dress is different from another brand's also does not establish, on its own, that the TOP trade dress is famous. Finally, although the district court's analysis in *North Atlantic* is not dispositive of the issue, it does suggest that there is a triable issue of fact as to whether the TOP mark is famous.

23

## V.    PERMANENT INJUNCTION

Plaintiffs seek a permanent injunction against all defendants. The Court has the power to enter such an injunction "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). The corporate defendants have offered no argument against issuing an injunction given the grant of summary judgment on Counts I-III, and the Court grants the requested relief, the terms of which are detailed below.

## CONCLUSION

For the foregoing reasons, the Individual Defendants' Motion for Summary Judgment [Doc. No. 191] is denied. Plaintiffs' Motion for Summary Judgment [Doc. No. 186] is granted against the Corporate Defendants on Counts I-III and denied as to all other counts and all other defendants.[6]

Furthermore, it is ordered that defendants Midwestern Cash and Carry LLC; Yale Gas and Food, Inc.; Southern Gas and Food Inc.; and South Chicago One, Inc.

---

[6]  Summary judgment is not granted as to Counts V, VI, or VIII. Although Plaintiffs correctly point out in reply that Defendants did not contest liability on those counts, neither did Plaintiffs adequately establish that summary judgment is warranted. A footnote in the memorandum merely lists the three counts and states: "The same facts that support Plaintiffs' federal trademark claims also support their Illinois state law causes of action," (Pls.' Mot. at 3. n.2), citing a 1953 case from the Seventh Circuit (without a proper pinpoint), that does not stand for the cited principle. Plaintiffs' brief neglects to set forth the elements of the state law claims and demonstrate that there are no issues of material fact preventing summary adjudication of those claims. To the extent that summary judgment on Counts I-III against the Corporate Defendants precludes relitigating certain facts or elements related to Counts V, VI, or VIII, that issue can be dealt with at trial.

d/b/a Clark Gas and Food, and their agents, servants, employees, attorneys, and those personnel or entities in active concert or participating with them who receive actual notice of this order by personal service or otherwise, are permanently enjoined from doing, or assisting others in doing, the following acts:

(i) using any reproduction, counterfeit, copy, or colorable imitation of the TOP Marks in connection with the importation, sale, offering for sale, or distribution of cigarette rolling papers in the United States, which cigarette rolling papers in fact are not connected with Top Tobacco or are not genuine Top Tobacco products, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(ii) using the TOP Marks or any reproduction, counterfeit, copy, or colorable imitation of the same in any manner likely to cause others to believe that Defendants' products are connected with Top Tobacco or are genuine Top Tobacco products if they are not, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(iii) passing off, inducing, or enabling others to sell or pass off any merchandise which is not genuine Top Tobacco merchandise as and for genuine Top Tobacco merchandise;

(iv) committing any other acts reasonably calculated to cause purchasers to believe that Defendants' products are Top Tobacco's products, when in fact such products are not Top Tobacco products;

(v) importing, shipping, delivering, distributing, holding for sale, returning, transferring, or otherwise moving or disposing of in any manner such cigarettes

falsely bearing one or more of the TOP Marks or any reproduction, counterfeit, copy, or colorable imitation of the same;

(vi) discussing or communicating any aspect of the seizure of counterfeit cigarette rolling papers or the identifying markers of counterfeit cigarette rolling papers with any person or entity selling or attempting to sell cigarette rolling papers to Defendants;

(vii) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above paragraphs (i) through (vi); and

(viii) other than by an order of this Court,

(1) selling, moving, destroying, or otherwise disposing of any goods, boxes, labels, packaging or other items or documents bearing any reproduction, counterfeit, or imitation of the TOP Marks, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(2) moving, destroying, or otherwise disposing of any business records or documents relating in any way to the manufacture, importation, acquisition, purchase, distribution, or sale of goods or merchandise bearing any of the TOP Marks or any reproduction, counterfeit, or imitation of the TOP Marks, which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(3) assisting any third party in identifying, moving, destroying, or otherwise disposing of any reproduction, counterfeit or imitation goods, as well as

any records pertaining to reproduction, counterfeit or imitation goods, which such use is likely to cause confusion, or to cause mistake, or to deceive.

Defendants Midwestern Cash and Carry LLC; Yale Gas and Food, Inc.; Southern Gas and Food Inc.; and South Chicago One, Inc. d/b/a Clark Gas and Food, and their agents, servants, employees, attorneys, and those personal or entities in active concert or participating with them who receive actual notice of this order by personal service or otherwise are warned that any act by them in violation of any of the terms of this Order may be considered and prosecuted as contempt of this Court.

**SO ORDERED.**                    **ENTERED:**

**DATE:** ___**January 22, 2014**___    _____
                                        **HON. MARIA VALDEZ**
                                        **United States Magistrate Judge**